UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN

In re:

| | |
|---|---|
| | Case No. 24-47188 |
| ETON STREET BREWERY, LLC, | Chapter 11 |
| | Hon. Mark A. Randon |
| Debtor. | |

---

**DEBTOR'S OBJECTION TO MOTION TO DISMISS, OR ALTERNATIVELY, ABSTAIN FROM ALL PROCEEDINGS IN THIS CASE AND TERMINATE THE AUTOMATIC STAY AND WAIVE THE STAY PROVIDED IN FED. R. BANKR. P. 4001(A)(3), OR, ALTERNATIVELY, TO TERMINATE THE AUTOMATIC STAY AND <u>WAIVE THE STAY PROVIDED IN FED. R. BANKR. P. 4001(A)(3)</u>**

Eton Street Brewery, LLC, the above-captioned Debtor, for its objection (the "Objection") to the *Motion to Dismiss, or Alternatively, Abstain from all Proceedings in this Case and Terminate the Automatic Stay and Waive the Stay Provided in Fed. R. Bankr. P. 4001(a)(3), or, Alternatively, to Terminate the Automatic Stay and Waive the Stay Provided in Fed. R. Bankr. P. 4001(a)(3)* (the "Motion") filed by the Mary E. Nicholson Trust u/a/d January 14, 1994 and the Michael Nicholson Trust u/a/d March 17, 1997 (the "Movants"), states as follows:

1.    On August 13, 2024 this Court entered its *Order Setting Briefing Schedule* (the "Order") where the Court set a briefing schedule requiring any motions regarding (a) Debtor's authority to file bankruptcy or (b) Debtor's Subchapter V

eligibility to be filed on or before August 19, 2024 and any responses thereto to be filed on or before September 3, 2024. *See* Docket No. 81.

2.     The Movants filed their Motion on August 19, 2024, alleging that this bankruptcy case was filed without requisite authority, but also then making a litany of other requests for relief pursuant to 11 U.S.C. § 1112(b) ("Section 1112(b)"),[1] Section 305, Section 362, and 28 U.S.C. §§ 1334(b) and (c), all clearly outside of the scope of this Court's Order.   The Movants do not challenge the Debtor's Subchapter V eligibility.

3.     While the vast majority of the Motion falls outside the scope of the Order, Debtor nevertheless, for the sake of efficiency and economy for this Court and the parties, responds herein to all of the Movants' requests for relief, none of which have merit.

4.     For the reasons stated below and in the attached brief in support of the Objection (the "Brief"), the Motion should be denied.

5.     The Motion begins with a request to dismiss this Bankruptcy Case pursuant to Section 305(a)(1). *See* Motion at ¶¶ 17-36, 94-98.  As more fully set forth in the Brief, relief under Section 305(a)(1) is clearly not appropriate in this case.  Section 305(a)(1) is appropriate only in rare scenarios, and where the movant

---

[1] References to the Bankruptcy Code, i.e., 11 U.S.C. §§ 101 – 1532, are referred to herein by their Section number.

2

can show that dismissal would be to the benefit *of the debtor itself* as well as *all other creditors*.  In this case, a dismissal would benefit only one party, the Movants, and would lead to the destruction of the business value of the Debtor, to the detriment of the Debtor and all other creditors. *See* Brief at pp. 5-8.

6.     The Motion then requests to dismiss this Bankruptcy Case pursuant to Section 1112(b) for alleged lack of corporate authority. *See* Motion at ¶¶ 37 – 47. As more fully set forth in the Brief, the Debtor's President had the explicit right to file the bankruptcy case, which even the Movant does not dispute.  Moreover, the filing of the bankruptcy case is not an action requiring unanimous consent of the members, applying the plain language of the Debtor's operating agreement according to applicable state and bankruptcy law. *See* Brief at pp. 8-19.

7.     The Motion then requests to dismiss this Bankruptcy Case pursuant to Section 1112(b)(4)(A) and (M), for the stated reason that there is allegedly "no reasonable likelihood of success". *See* Motion at ¶¶ 48–49.  As more fully set forth in the Brief, Section 1112(b)(4)(A) states as a ground for dismissal "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation".  Because there is no "substantial or continuing loss to or diminution of the estate", nor is any alleged, the latter portion of that provision does not come into play - there is no "diminution" to "rehabilitate".  With respect to Section 1112(b)(4)(M) and the alleged "inability to effectuate substantial

consummation of a confirmed plan", this is also irrelevant, as this provision relates to cases where a Debtor has already confirmed a plan but is unable to achieve substantial consummation. But even assuming arguendo that the Debtor's "means or intent for reorganization" (Motion at ¶49) was a factor for dismissal, the Debtor in fact has every ability in this case to confirm a plan pursuant to section 1191 in this case, *i.e.,* a plan to distribute the assets of the estate that would primarily be from the proceeds of the sale of substantially all of its assets. *See* Brief at pp. 20-21.

8.     The Motion next requests to dismiss this Bankruptcy Case pursuant to Section 1112(b) "for cause" due to alleged "bad faith". *See* Motion at ¶¶ 50–51. As more fully set forth in the Brief, the case law with respect to Section 1112(b) dismissal for bad faith makes clear that to determine bad faith, a court "must require a pattern of concealment, evasion, and direct violations of the Code or court order which clearly establishes an improper motive before allowing dismissals for bad faith." The case law also makes clear that cases such as this one, where a Debtor files a case for protection from a creditor, in an effort to preserve the value of its assets for the benefit of the entire estate, does *not* constitute bad faith. *See* Brief at pp. 22-26.

9.     The Movants then shift gears, next requesting that this Court abstain from hearing this entire bankruptcy case pursuant to 28 U.S.C. §§ 1334(b) and (c) and grant relief from the automatic stay in conjunction therewith. *See* Motion at ¶¶

4

52 – 111.  As more fully set forth in the Brief, the relief Movants request in this regard is simply not available. Abstention pursuant to 28 U.S.C. § 1334 applies only to *particular proceedings within a bankruptcy case*, not the case in general – which is the purview of Section 305, discussed above. *See* Brief at pp. 26-29.

10.    The Motion ends with a request for relief from the automatic stay pursuant to Section 362(d) "for cause". *See* Motion at ¶¶ 58 – 93, 112 – 114.  As more fully set forth in the Brief, much like Movants' request for Section 1112(b) dismissal "for cause" due to "bad faith", the Movants also fail to show any grounds for relief from the automatic stay "for cause."  At best, Movants' request for relief from the automatic stay, like its request for abstention, is clearly premature at this stage in the case, where a contested claim matter has not yet even arisen with respect to the Movants' unsecured claim which is the subject of their state court litigation with respect to the Debtor.  *See* Brief at pp. 29-37.

WHEREFORE, for the reasons set forth above and in the Brief in Support of this Objection, this Court should dismiss the Motion.

VARNUM LLP
*Counsel to Debtor*

Dated: September 3, 2024          By:   */s/ Brendan G. Best*
                                  Brendan G. Best (P66370)
                                  480 Pierce Street, Suite 300
                                  Birmingham, Michigan 48009
                                  (313) 481-7326
                                  bgbest@varnumlaw.com

5

In re:

ETON STREET BREWERY, LLC,

      Debtor.

Case No. 24-47188
Chapter 11
Hon. Mark A. Randon

---

**BRIEF IN SUPPORT OF DEBTOR'S OBJECTION TO MOTION TO
DISMISS, OR ALTERNATIVELY, ABSTAIN FROM ALL PROCEEDINGS
IN THIS CASE AND TERMINATE THE AUTOMATIC STAY AND
WAIVE THE STAY PROVIDED IN FED. R. BANKR. P. 4001(A)(3), OR,
ALTERNATIVELY, TO TERMINATE THE AUTOMATIC STAY AND
WAIVE THE STAY PROVIDED IN FED. R. BANKR. P. 4001(A)(3)**

# TABLE OF CONTENTS

INDEX OF EXHIBITS ..................................................................................................III

INDEX OF AUTHORITIES ......................................................................................... IV

I.    INTRODUCTION ................................................................................................1

II.   BACKGROUND SECTION ................................................................................3

III.  DISMISSAL PURSUANT TO 11 U.S.C. § 305(A)(1) IS NOT
      WARRANTED OR APPROPRIATE BECAUSE MOVANT HAS
      FAILED TO MEET ITS BURDEN TO PROVE THAT IT WOULD
      BE IN THE BEST INTEREST OF BOTH THE CREDITORS AND
      THE DEBTOR .....................................................................................................5

IV.   DISMISSAL PURSUANT TO 11 U.S.C. § 1112 IS NOT
      WARRANTED OR APPROPRIATE BECAUSE THE CASE WAS
      FILED WITH REQUISITE AUTHORITY AND THE MOVANTS
      FAIL TO SHOW ANY OTHER BASES FOR SECTION 1112
      DISMISSAL .......................................................................................................8

      A.    THE CASE WAS FILED WITH REQUISITE AUTHORITY .............................8

      B.    MOVANTS FALL FAR SHORT OF ESTABLISHING ANY BASIS FOR
            DISMISSAL PURSUANT TO 11 U.S.C. § 1112(B) "FOR CAUSE" OR
            FOR "BAD FAITH"; DEBTOR'S CASE WAS CLEARLY FILED IN GOOD
            FAITH AND IS COMPLIANT WITH ALL BANKRUPTCY CODE
            REQUIREMENTS .................................................................................19

V.    THE MOTION'S REQUEST FOR PERMISSIVE OR MANDATORY
      ABSTENTION AND RELATED RELIEF FROM THE
      AUTOMATIC STAY MUST BE DENIED, BECAUSE THE
      MOTION DOES NOT REQUEST ABSTENTION OF ANY
      PARTICULAR MATTER, BUT RATHER "ABSTENTION" FROM
      THE ENTIRE BANKRUPTCY CASE WHICH CANNOT BE
      GRANTED .......................................................................................................26

      A.    MOVANTS' REQUEST TO PERMISSIVELY OR MANDATORILY
            ABSTAIN FROM THE ENTIRE BANKRUPTCY IS IMPROPER AND
            MUST BE DENIED...............................................................................26

i

B.    REQUEST FOR RELIEF FROM AUTOMATIC STAY RELATED TO ABSTENTION NOT WARRANTED ............................................................29

VI.    MOTION FOR RELIEF FROM THE AUTOMATIC STAY "FOR CAUSE" SHOULD BE DENIED BECAUSE MOVANT FAILS TO MAKE ANY SHOWING OF CAUSE............................................................29

VII.    CONCLUSION............................................................................37

# INDEX OF EXHIBITS

Exhibit A – Transcript Excerpts from August 13, 2024 Hearing

Exhibit B – First Amended and Restated Operating Agreement of Eton Street Brewery, LLC (the "AROA")

Exhibit C – *In re Energy Drilling Services*: *Opinion and Order Denying Motion to Dismiss*

Exhibit D – Debtor's Voluntary Petition and Resolution Authorizing Bankruptcy Filing

# INDEX OF AUTHORITIES

## Cases

*Dobbelaere v. Auto-Owners Ins. Co.*,
740 N.W.2d 503 (Mich. Ct. App. 2007)........................................................9

*Gedeon v. Ballet Academy of Pittsburgh, Inc.* (*In re Piper*),
548 B.R. 426 (Bankr. W.D. Pa. 2016)........................................................27

*In re Adler*,
467 B.R. 279 (Bankr. E.D.N.Y. 2012) .......................................................14

*In re Andrus,*
338 B.R. 746 (Bankr. E.D. Mich. 2006)......................................................28

*In re Atlas Automation, Inc.*,
42 B.R. 246 (Bankr. E.D. Mich. 1984)........................................................28

*In re Betty Owens Sch., Inc.*,
No. 96-cv-3576 (PKL), 1997 WL 188127 (S.D.N.Y. Apr. 17, 1997) ..........15

*In re Birmingham Cosmetic Surgery,* P.L.L.C.,
2015 WL 1404296 (Bankr. E.D. Mich. 2015)...............................................30

*In re Butterfliez Servs., LLC*,
563 B.R. 531 (Bankr. S.D. Ohio 2016) .......................................................15

*In re Cambrian Holding Co., Inc.*,
No. 23-5507, 2024 WL 3665543 (6th Cir. Aug. 6, 2024)............................15

*In re Checker Motors Corp.*,
No. 09-00358, 2011 WL 2746634  (Bankr. W.D. Mich. Mar. 31, 2011) .....21

*In re Cherry Growers, Inc.*,
595 B.R. 882 (Bankr. W.D. Mich. 2018) ....................................................21

*In re Cmty. Mem'l Hosp. Chapter 11*,
No. 12-20666, 2012 WL 13330937 (Bankr. E.D. Mich. Mar. 9, 2012)........21

*In re ComScape Telecommunications, Inc.*,
423 B.R. 816 (Bankr. S.D. Ohio 2010) .......................................................19

iv

*In re Crowley, Milner & Co.*,
299 B.R. 830 (Bankr. E.D. Mich. 2003)........................................................21

*In re Curtis*,
40 B.R. 795 (Bankr. D. Ut. 1984) ................................................................33

*In re Double G Ranch, LLC*,
No. 10-53029, 2009 WL 10818851 (Bankr. E.D. Mich. Nov. 24, 2009) .....21

*In re East End Development, LLC*,
491 B.R. 633 (Bankr. E.D.N.Y. 2013) .........................................................17

*In re Eastman*,
188 B.R. 621 (B.A.P. 9th Cir. 1995) ..............................................................6

*In re Encapsulation Int'l, LLC*,
226 B.R. 614 (Bankr. W.D. Tenn. 1998) ......................................................16

*In re Energy Conversion Devices, Inc.*,
634 B.R. 537 (Bankr. E.D. Mich. 2021)........................................................21

*In re Energy Drilling Services*,
Case No. 22-312772 ......................................... 9, 11, 12, 13, 17, 19

*In re ExpressTrak, L.L.C.*,
2004 WL 3735126 (Bankr. E.D. Mich. Jan. 20, 2004) .................................34

*In re Garzoni*,
35 Fed. Appx. 179 (6th Cir. 2002) ...............................................................33

*In re Gucci*,
174 B.R. 401 (Bankr. S.D.N.Y 1994) ...........................................................23

*In re James*,
No. 05-46095-DML-7, 2005 WL 6443631, 2005 Bankr. LEXIS 2047
(Bankr. N.D. Tex. Oct. 18, 2005)..................................................................10

*In re Martin*,
542 B.R. 199 (6th Cir. B.A.P. 2015) ............................................................33

*In re McDowell*,
483 B.R. 471 (Bankr. S.D. Tex. 2012)..........................................................10

v

*In re Nartron Corp.*,
  330 B.R. 573 (Bankr. W.D. Mich. 2005) ......................................................15

*In re Noble Int'l, Ltd.*,
  No. 09-51720-MBM, 2009 WL 8519710 (Bankr. E.D. Mich. Apr. 15, 2009)
  ..............................................................................................................21

*In re Plastech Engineered Products, Inc.*,
  418 B.R. 235 (Bankr. E.D. Mich. 2009)................................................ 31, 33

*In re Purina Mills, Inc.*,
  No. 99-3938-SLR, 2002 WL 125677 (Bankr. D. Del. Jan. 28, 2002) .........27

*In re Ray*,
  314 B.R. 643 (Bankr. M.D. Tenn. 2004)...................................................16

*In re RHTC Liquidating Co.*,
  424 B.R. 714 (Bankr. W.D. Pa. 2010)...........................................................6

*In re Senior Hous. Alternatives, Inc.*,
  444 B.R. 386 (Bankr. E.D. Tenn. 2011).....................................................15

*In re Solomons One*, LLC,
  2013 WL 5934656 (Bankr. D. Md. 2013) ...................................................17

*In re Sonnax*,
  907 F.2d 1280 (2nd Cir. 1990) ................................................. 32, 33, 35, 36

*In re St. James Nursing & Physical Rehab. Ctr., Inc.*,
  645 B.R. 220 (Bankr. E.D. Mich. 2022).....................................................21

*In re Tempo Tech. Corp.*,
  202 B.R. 363 (D. Del. 1996).......................................................................15

*In re The Northwest Company*,
  2020 WL 2121269 (Bankr. S.D.N.Y. May 1, 2020) ...................................18

*In re Visicon S'holders Tr.*,
  478 B.R. 292 (Bankr. S.D. Ohio 2012) ......................................................16

*Matter of Garrison*,
  5 B.R. 256 (1980) .......................................................................................34

24-47188-mar   Doc 101   Filed 09/03/24   Entered 09/03/24 21:22:52   Page 12 of 110

*Matter of Holly's, Inc.*,
 140 B.R. 643 (Bankr. W.D. Mich. 1992) ....................................................34

*Matter of Hulse*,
 66 B.R. 681 (Bankr. M.D. Fla. Nov. 6, 1986)...............................................22

*Price v. Gurney*,
 324 U.S. 100 (1945)....................................................................................18

*Solo v. United Parcel Service Co.*,
 819 F.3d 788 (6th Cir. 2016) ........................................................................9

*Titan Ins. Co. v. Hyten*,
 817 N.W.2d 562 (Mich. 2012) .......................................................................9

*United Grocers, Ltd. v. United States*,
 186 F. Supp. 724 (N.D. Cal. 1960).............................................................14

## <u>Statutes</u>

11 U.S.C. § 301 ...............................................................................................10

11 U.S.C. § 305(a)(i)............................................................................... 5, 6, 8

11 U.S.C. § 363(b) ...........................................................................................13

11 U.S.C. § 363(b)(1)........................................................................................15

11 U.S.C. § 541(c)(1).......................................................................................16

11 U.S.C. § 1107(a) .........................................................................................15

11 U.S.C. § 1108..............................................................................................13

11 U.S.C. § 1112.......................................................................................... 26, 29

11 U.S.C. § 1112(b) ..................................................................................... 19, 21

11 U.S.C. § 1112(b)(4)................................................................................. 20, 24

11 U.S.C. § 1112(b)(4)(A)...............................................................................20

11 U.S.C. § 1112(b)(4)(M) ..............................................................................20

28 U.S.C. § 1334 ..................................................................28

28 U.S.C. § 1334(a) .............................................................26

28 U.S.C. § 1334(c) ........................................................ 27, 29

28 U.S.C. § 1334(c)(1) .....................................................27, 28

28 U.S.C. § 1334(c)(2) ..........................................................27

28 U.S.C. § 1334(d) ..............................................................29

## Other Authorities

2 *Collier on Bankruptcy*
(Richard Levin & Henry J. Sommer eds., 16th ed.) ........................ 5, 6, 7, 28

7 *Collier on Bankruptcy*
*(Richard Levin & Henry J. Sommer eds., 16th ed.)* .......................................20

## Rules

Fed. R. Bankr. P. 4001(a)(3) .................................................................37

## I.      INTRODUCTION

Underlying much of the Motion is the fact that the Movants have filed a collection action in Michigan state court against the Debtor to obtain a judgment for payment of a promissory note, which it hoped to enforce against the Debtor in state court through a state court receivership. That effort was stayed by the filing of the bankruptcy case. The Movants believe that they should be allowed to continue on that path, notwithstanding the commencement of a completely different form of proceeding, *i.e.*, a Chapter 11 bankruptcy case. They are wrong. If they were right, bankruptcy court would be a very flimsy refuge for debtors indeed, and would be rendered virtually meaningless.

In some circumstances, pre-petition creditors may get relief from the stay and have the Bankruptcy Court abstain from adjudicating (but not enforcing) their disputed unsecured claims, but such request is entirely premature in this case. In this case, for example, Chase Bank asserts a claim allegedly secured by all of the assets of the Debtor in the amount of $2.6 million. *See* **Exhibit A**, excerpt from Transcript for August 13, 2024 Hearing, pp. 66-67. Should Chase Bank prevail in establishing a secured claim with respect to all the assets of the Debtor,[2] then it could

---

[2] Nothing herein should be deemed to be an admission related to the validity or allowability of any creditors' claims, including Chase Bank. Debtor reserves all rights to object to the allowance of any claim, on any basis.

assert a first priority right to payment from all assets of the estate, leaving in question whether there would be any assets of the estate left to pay any unsecured creditors in the case, whether the Movants' claims or any other unsecured claims. Only if an unsecured claims adjudication process was warranted in this case could the Movants then credibly request that this Court abstain from hearing matters related to its claim pending in the state court, and then only if the claim could not be reconciled consensually, and only if this Court also determined that such matters were necessary for the adjudication of the disputed claim and could better be handled by the state court.[3]   In any event, Movants would not be entitled under any circumstances to relief from the state to *enforce* their unsecured claim.

In pursuit of their fervent desire to continue on the path they were on prior to the petition being filed, the Movants therefore make a litany of arguments, bordering on the frivolous, that this Bankruptcy Case, in some way, shape, or form, be nullified so that its state court collection enforcement action against the Debtor can continue. Particularly with respect to their request for dismissal for alleged lack of requisite corporate authority, that request, like the others, lacks any merit. As explained below, the Debtor's Manager and President was granted the authority to file this proceeding pursuant to the clear and plain language of the Debtor's operating

---

[3] Debtor reserves all rights with respect to any future requests for relief from the automatic stay or any other requests for relief.

agreement, which also, pursuant to its clear and plain language, does *not* require unanimous or other consent for the filing of a bankruptcy case.

## II.     BACKGROUND SECTION[4]

Prior to the formation of the Debtor in 2011, Norm LePage and Ray Nicholson were business partners in numerous successful business ventures.[5] With the momentum of their prior ventures, they spearheaded the formation of the Debtor in 2011, to own and operate a large-scale brewing operation - Griffin Claw Brewery - at a single location in Birmingham, Michigan.  The initial members of the Debtor were their wives, through their respective trusts.  Around the time that the Debtor started, Ray Nicholson, through the Mary E. Nicholson Trust u/a/d 1/14/1988 (the "Trust"), one of the Movants, contributed capital to the Debtor that was documented in the form of a promissory note (the "Note").  The Trust has a scheduled, unsecured claim in this case in the amount of $3,678,632.17 listed as contingent, unliquidated and disputed.  Upon information and belief, the Movants assert that the unsecured claim amount is in excess of $8 million.

In or around 2017, Ray Nicholson and the LePage family began discussing the expansion of the Debtor's operations into a second location in Rochester,

---

[4] *See also* First Day Declaration of Scott LePage (Dkt. No. 14).

[5] During the 2000s, Ray Nicholson also sold a company that he owned, Retail Grocery Inventory Systems (RGIS), for roughly $1.2 billion.

Michigan. Specifically, Ray Nicholson desired to have the Debtor acquire the profitable Clubhouse BFD ("Clubhouse") restaurant in Rochester owned by the LePage family (specifically, Scott LePage and his father Norman LePage.) The LePages agreed, subject to one important condition discussed below, and in August 2019, Clubhouse was transferred to the Debtor through two transactions, with the majority of the purchase price to be paid to the seller entities of the Clubhouse assets in future installment payments. A key condition of the Clubhouse deal was that payment of the Movants' Note was to be subordinated to payment of the purchase price obligations for Clubhouse, because the LePage family was receiving its primary income from the revenue from Clubhouse, and the LePage family required immediate commencement of payments of the seller financing to replace that income. While most or all of the purchase price was paid to the respective LePage family entity for the transfer of the Clubhouse real estate pursuant to the agreement, the purchase price for the non-real estate assets has not been paid, and the seller entity asserting a right to such payment, *i.e.,* Restaurant Management, II, has a scheduled, unsecured claim in this case in the amount of $3,587,524.50 also listed as contingent, unliquidated and disputed.

After the unfortunate passing of Ray Nicholson in 2019, the heirs of Mr. Nicholson, through the Movants and their attorneys, eventually brought a claim against the Debtor for immediate repayment of the Note in a state court proceeding,

along with other claims against other non-Debtor entities, notwithstanding the terms of the Clubhouse deal. The Debtor was unable, both prior to commencement of the litigation and afterwards, including in two attempts at mediation, to resolve the demands of the Movants for immediate satisfaction of the Note, rendering the Debtor insolvent. The Debtor was therefore ultimately forced to file this Chapter 11 case to prevent the Movants from potentially obtaining a judgment it could not satisfy and placing the Debtor into an undefined receivership that would at best severely disrupt and diminish the value of Debtor, but most likely cause the shut down and piecemeal liquidation of the Debtor, to the detriment of all creditors.

## III.    DISMISSAL PURSUANT TO 11 U.S.C. § 305(A)(1) IS NOT WARRANTED OR APPROPRIATE BECAUSE MOVANT HAS FAILED TO MEET ITS BURDEN TO PROVE THAT IT WOULD BE IN THE BEST INTEREST OF BOTH THE CREDITORS AND THE DEBTOR

The Movants' request for dismissal of these proceedings under 11 U.S.C. § 305(a)(i) fails because this case is far from one of those "rare occasions" where such relief is warranted. *See* 2 *Collier on Bankruptcy* ¶ 305.01[2] (Richard Levin & Henry J. Sommer eds., 16th ed.). "Section 305 is reserved for those rare occasions *when both the creditors generally and the debtor itself* are better served by dismissal or suspension." *Id*. (*emphasis added*).

5

The Movants fail to cite any facts or make any argument as to why dismissal would better serve *both all of the other creditors as well as the Debtor.* On this basis alone, the Nicholson's argument must fail. *See generally Motion* at ¶¶ 17-36.

Under Section 305(a)(1), the moving party bears the burden to demonstrate that dismissal benefits the debtor and its creditors. *See In re RHTC Liquidating Co*., 424 B.R. 714, 720-721 (Bankr. W.D. Pa. 2010). The Bankruptcy Appellate Panel for the Ninth Circuit has formulated the Section 305(a)(1) analysis as follows:

> As the statutory language and legislative history demonstrate, the test under § 305(a) is not whether dismissal would give rise to a substantial prejudice to the debtor. Nor is the test whether a balancing process favors dismissal. Rather, the test is whether both the debtor and the creditors would be "better served" by a dismissal.[6]

Because of this requirement, few fact patterns fall within the requirement of Section 305(a)(1). See 2 *Collier on Bankruptcy* ¶ 305.01[2][a] (Richard Levin & Henry J. Sommer eds., 16th ed.).

Movants argue that "the Bankruptcy Case is a two-party dispute between the LePage family and" the Movants. *See* Motion ¶35. However, the same material cited by the Movants explains why, to the extent that there was a "two-party dispute" between the Movants and the Debtor (as well as other co-defendants) in the state

---

[6] *In re Eastman*, 188 B.R. 621, 625 (B.A.P. 9th Cir. 1995).

court proceeding, the reference to a "two-party dispute" in the context of Section 305 relief means something very different.

> Dismissal or suspension of a case may be appropriate when the bankruptcy case constitutes a two-party dispute between the debtor and a single creditor. For instance, in *In re Rookery Bar, Ltd.* [190 B.R. 949, 951], a judgment creditor filed an involuntary case against the debtor in a single asset case. An appeal from the petitioning creditor's judgment was pending. All other creditors had agreed to defer collection of their debts from the debtor. Upon the debtor's motion for abstention under section 305(a)(1), the court suspended any further proceedings in the case until the two-party dispute was resolved in state court. Even in a two-party dispute case, the court should consider whether dismissal would be in the interest of both the debtor and the creditor.
>
> **Conversely, when the debtor has commenced a bankruptcy case, demonstrated a need for reorganization, *and dismissal or suspension of the case would primarily serve the interests of, for instance, a mortgagee seeking possession of the debtor's property in state court*, section 305(a)(1) relief is inappropriate. Debtors should be permitted an opportunity to reorganize and section 305(a)(1) is not a basis for impinging upon or abridging that right.**

2 *Collier* at ¶ 305.02[2][d] (emphasis added).

As one can see, only in a true Section 305 "two-party dispute" situation, such as where a creditor puts a debtor into an involuntary bankruptcy proceeding which would benefit only that creditor, to the determent of both the debtor and other creditors, Section 305 relief would be appropriate.

On the other hand, where a debtor is confronted with the existential threat of a creditor seeking to obtain a judgment and enforce its judgment creditor remedies

7

against the debtor, to the detriment of both the debtor and all other creditors, such as the case at hand, Section 305 relief clearly does not come into play. The facts alleged by the Movants clearly do not meet the standard required for the Movants to avail themselves of the rare relief under Section 305(a)(1), and thus, Movants request for dismissal thereunder should be denied.

## IV. DISMISSAL PURSUANT TO 11 U.S.C. § 1112 IS NOT WARRANTED OR APPROPRIATE BECAUSE THE CASE WAS FILED WITH REQUISITE AUTHORITY AND THE MOVANTS FAIL TO SHOW ANY OTHER BASES FOR SECTION 1112 DISMISSAL

### A. THE CASE WAS FILED WITH REQUISITE AUTHORITY

The Motion argues that this case should be dismissed because Bonnie LePage (the "Managing President") allegedly lacked the authority to commence this Chapter 11 proceeding (the "Bankruptcy Case"). *See* Motion at ¶¶ 39-47. As explained below, the Debtor's Managing President had the *explicit* right to file the bankruptcy case, which even the Movant does not dispute. Moreover, the filing of the bankruptcy case is not an action, as the Movants argue, requiring unanimous consent of the members, under the plain language of the Debtor's operating agreement.

The *First Amended and Restated Operating Agreement of Eton Street Brewery, LLC* (attached as **Exhibit B**) (the "AROA") broadly empowers the President "to do *all things* necessary or convenient to carry out the Company's business and affairs, including the power to . . . (9) begin, prosecute, or defend any

8

proceeding in the Company's name . . . ." (emphasis added). *See* **Exhibit B** at p.6, ¶6.2.

An "Operating Agreement is a contract, the interpretation and construction of which presents a question of law for the Court to decide." *See In re Energy Drilling Services*, Case No. 22-312772, *Opinion and Order Denying Motion to Dismiss* attached hereto as **Exhibit C**, p.10, *citing Titan Ins. Co. v. Hyten*, 817 N.W.2d 562 (Mich. 2012). "The fundamental goal of contract interpretation is to determine and enforce the parties' intent by reading the agreement as a whole and applying the plain language used by the parties to reach their agreement." *Dobbelaere v. Auto-Owners Ins. Co.*, 740 N.W.2d 503, 529 (Mich. Ct. App. 2007). "The Court must also endeavor to give effect to every word, phrase, and clause in a contract, and avoid a contract interpretation that would render any part of the contract surplusage or nugatory." *In re Energy Drilling Services, id., citing Solo v. United Parcel Service Co.*, 819 F.3d 788, 794 (6th Cir. 2016) (applying Michigan law).

By filing this Chapter 11 proceeding, the President "beg[an] [a] proceeding in the Company's name." *See* **Exhibit B** at p.6, ¶6.2(9). *See also* **Exhibit D** (*Voluntary Petition* and *Resolution Authorizing Bankruptcy Filing*). The plain and ordinary meaning of the word "began" is "to do the first part of an action; go into the first part of a process." www.merriam-webster.com. The plain and ordinary meaning of the word "proceeding" is a "legal action." www.merriam-webster.com. A bankruptcy

9

case is a "legal action". *See e.g., In re McDowell*, 483 B.R. 471, 494 (Bankr. S.D. Tex. 2012) (holding that "the filing of a bankruptcy petition constitutes the filing of a lawsuit" and that documents prepared in anticipation of a bankruptcy filing are prepared for litigation) (*also citing In re James*, No. 05–46095–DML–7, 2005 WL 6443631 at *2, 2005 Bankr. LEXIS 2047, at *5 (Bankr. N.D. Tex. Oct. 18, 2005) ("the commencement of a bankruptcy case is a legal action. . . ."))

Therefore, under the plain and ordinary meaning of the AROA, Bonnie LePage, the Managing President of the Debtor, was authorized to *begin*, *i.e.*, file the initial voluntary petition pursuant to 11 U.S.C. § 301, a *proceeding*, *i.e.*, the legal action of a bankruptcy case.

The Movant does not contest the Debtor's President's right to file the proceeding pursuant to ¶6.2(9) of the AROA. Rather, Movant argues, without any legal support, that that the filing of the bankruptcy case is the equivalent of other activities which do require unanimous consent of all of the members of the Debtor pursuant to ¶6.3 of the AROA. *See* Motion at ¶44.

Section 6.3 of this Debtor's AROA requires unanimous consent for the following actions only:

> (1)    any significant and material purchase, receipt, lease, exchange, or other acquisition of any real or personal property or business;

> (2)    the sale of all or substantially all of the assets and property of the Company;

(3)     any mortgage, grant of security interest, pledge, or encumbrance on all or substantially all of the assets and property of the Company;

(4)     any merger;

(5)     any amendment or restatement of the Articles or this Operating Agreement;

(6)     any matter that could result in a change in the amount or character of the Company's capital;

(7)     any change in the character of the business and affairs of the Company;

(8)     the commission of any act that would make it impossible for the Company to carry on its ordinary business and affairs; or

(9)     any act that would contravene any provision of the Articles, Operating Agreement, or the Act.[7]

Contrary to the argument of the Movant, the filing of the bankruptcy case is clearly *not* one of the actions listed in ¶6.3 of the AROA requiring unanimous consent, based on the plain language of the AROA.  The opinion of *In re Energy Drilling Services*, *id.*, is instructive in this regard.  In that opinion, the Bankruptcy Court similarly held that filing a petition under Chapter 11 of the Bankruptcy Code was not the equivalent of a similar list of actions, in that case defined as "Fundamental Business Transactions".

---

[7] The "Act" refers to the Michigan Limited Liability Company Act, Mich. Comp. Laws §§ 450.4101 - .5200.

This Court will first address whether placing EDS in chapter 11 (subchapter V) bankruptcy is a Fundamental Business Transaction. As previously noted, a super-majority is required to enter into a Fundamental Business Transaction. Fundamental Business Transaction "means those major transactions of the Company, including (a) merger, (b) an interest exchange, (c) a conversion, (d) sale of all or substantially all of an entity's assets (with or without good will), other than in the ordinary course of the Company's business, or (e) any other strategic acquisition of a target company, whether by acquisition of assets or equity." (emphasis added). The plain and ordinary meaning of the word "transaction" is "something transacted -- especially an exchange or transfer of goods, services, or funds." Merriam-Webster.com . . . . **The filing of a petition under chapter 11 of the Bankruptcy Code is not included in the definition of Fundamental Business Transaction for the simple reason that the filing of a petition under chapter 11 of the Bankruptcy Code is not a transaction as that term is defined or used in the Operating Agreement.**

*In re Energy Drilling Services, id. at p.12.*

In the case at hand, as discussed in more detail below, the filing of a petition under chapter 11 of the Bankruptcy Code was also not a transaction, purchase, sale, change in the "character and affairs" of the business, or any other action as those terms are defined or used in this Debtor's operating agreement.

Specifically, the items listed in Section 6.3(a)(1) – (5) of the AROA clearly are not the equivalent of the "beginning" of a "proceeding." Like the case of *In re Energy Drilling Services*, those items fall under the general category of a "transaction", and "the filing of a petition under chapter 11 of the Bankruptcy Code

is not a transaction as that term is defined or used in the Operating Agreement." *See In re Energy Drilling Services, id.*

Next, the items in Section 6.3(a)(7)–(9) could be fairly characterized not as "transactions" but rather as other affirmative actions, *i.e.*, actions to change the character of the business and affairs of the Company, to commit any act that would make it impossible for the Company to carry on its ordinary business and affairs, or to commit an act that would contravene any provision of the Articles, Operating Agreement, or the Act. Likewise, those items are also clearly not the equivalent of the "beginning" of a "proceeding." Beginning a proceeding, by itself, does not automatically "change the character of the business and affairs of the Company" or make it "impossible for the Company to carry on its ordinary business and affairs." Indeed, this particular proceeding, a Chapter 11 bankruptcy, is designed *not* to have those effects, but rather, to allow the debtor to continue to operate its business in the ordinary course. *See e.g.,* 11 U.S.C. § 1108; *See also* 11 U.S.C. § 363(b). Beginning a proceeding is also not an act that would contravene any provision of the Articles, Operating Agreement, or the Act, because nothing therein prohibits the President from initiating a proceeding (including filing a bankruptcy case), and the AROA specifically *authorizes* the President to do so.

Lastly, the item set forth in 6.3(6) falls under a different category, *i.e.*, "any matter that could result in a change in the amount or character of the Company's

capital."  As with the other categories discussed above, the commencement of a proceeding clearly does not result in a change of amount or character of Debtor's "capital," *i.e.,* an alteration in the structure, composition, or total value of the assets that the Debtor holds.  While neither the AROA nor the Act includes an express definition of the term "capital," courts have interpreted (in the corporate context) "capital" to mean "the money, property or means contributed by stockholders as the fund or basis for the business or enterprise for which the corporation was formed."  The term generally implies that such money, property or means have been contributed in payment for stock issued to the contributors."  *In re Adler*, 467 B.R. 279, 289–90 (Bankr. E.D.N.Y. 2012) *citing United Grocers, Ltd. v. United States*, 186 F. Supp. 724, 729 (N.D. Cal. 1960).  Clearly, the filing of a chapter 11 bankruptcy case does not alter the amount or character of a debtor's "capital."

Importantly, Section 6.3(6) also makes clear that the drafters of the AROA knew how to draft a provision that includes the "results" of a different action.  In other words, had the drafters intended on agreeing to a contract as suggested by Movant, they would have drafted Section 6.2(9) differently, with additional, limiting language, *e.g.,* "begin, prosecute, or defend any proceeding in the Company's name *that does not result in any of the events enumerated in Section 6.3*."  The power to begin proceedings in Section 6.2(9) is clearly *not* limited as such, as emphasized in Section 6.2's earlier language giving "[t]he President . . . *the power, on behalf of the*

14

*Company, to do all things necessary or convenient to carry out the Company's business and affairs, including the power to . . . . begin, prosecute, or defend any proceeding in the Company's name . . . ."*

In summary, under the plain and ordinary language of the AROA, Bonnie LePage was authorized under Section 6.2 to begin this proceeding, *i.e.*, file the Chapter 11 petition, and the filing was not one of the actions that required unanimous consent of all Members under Section 6.3.

In the context of its eligibility argument, the Movants state that "the Debtor is attempting to effectuate a sale of substantially all of its assets and property." *See* Motion at ¶44. It is important to note that "[a]fter notice and a hearing, a debtor-in-possession may sell all or substantially all of its assets if the proposed sale is approved by the court." *In re Betty Owens Sch., Inc.*, No. 96-cv-3576 (PKL), 1997 WL 188127, at *4 (S.D.N.Y. Apr. 17, 1997), *citing In re Tempo Tech. Corp.*, 202 B.R. 363, 365–66 (D. Del. 1996). "The debtor-in-possession need not obtain shareholder approval for such sales." *Id.* (citation omitted).[8] Thus, to the extent that

---

[8] A Debtor's right to sell assets pursuant to Section 363 is very clear. *See e.g., In re Cambrian Holding Co., Inc.*, No. 23-5507, 2024 WL 3665543, at *1 (6th Cir. Aug. 6, 2024) (citing 11 U.S.C. § 1107(a)). "Among other things, the debtor may sell property of the estate other than in the ordinary course of business." *Id.* (citing 11 U.S.C. § 363(b)(1)) (quotation marks omitted). *See also*, *In re Nartron Corp.*, 330 B.R. 573, 593 (Bankr. W.D. Mich. 2005) ("When the Chapter 11 petition was filed, the debtor-in-possession assumed the same fiduciary duties as would an appointed trustee."); *In re Senior Hous. Alternatives, Inc.*, 444 B.R. 386, 392 (Bankr. E.D. Tenn. 2011) ("In a chapter 11 case, a debtor in possession has the same rights as the trustee under § 363."); *In re Butterfliez Servs., LLC*, 563 B.R. 531, 534 n 1 (Bankr. S.D. Ohio 2016) ("With limited exceptions, a debtor in possession is given all the rights and powers of a trustee serving in a case

Movants' motion may be interpreted as an argument that Debtor's right to sell assets pursuant to Section 363 is in any way restricted by or governed by the AROA, such argument must be soundly rejected.

As its final argument regarding authority to file this proceeding, Movant states in its Motion at paragraph 45 that:

> Bonnie LePage caused the Debtor to file bankruptcy without the affirmative vote or written consent of the Trusts. *Any anti-alienation provisions in the Operating Agreement are invalid.* Therefore, the Bankruptcy Case was filed without proper authority and must be dismissed.
>
> *See* Motion at ¶45 (emphasis added) (*citing* 11 U.S.C. § 541(c)(1)) (other citations omitted).

First, nowhere in the AROA is the "the affirmative vote or written consent of the Trusts" required to file a Chapter 11 proceeding, which the President is explicitly empowered to do pursuant to Section 6.2(9). *See* **Exhibit B** at p.6, ¶6.2(9); *see above*. Second, there are no "anti-alienation" issues present in this case, and hence it is unclear what Movant is attempting to argue in paragraph 45.[9]

---

under Chapter 11."); *In re Visicon S'holders Tr.*, 478 B.R. 292, 313 n 38 (Bankr. S.D. Ohio 2012) ("When a trustee has not been appointed, a debtor in possession generally has the rights of a trustee."); *In re Ray*, 314 B.R. 643, 659 (Bankr. M.D. Tenn. 2004) ("By virtue of section 1107(a), a chapter 11 debtor in possession is treated as a bankruptcy trustee."); *In re Encapsulation Int'l, LLC*, 226 B.R. 614, 616 n 1 (Bankr. W.D. Tenn. 1998) ("Section 1107(a) of the Bankruptcy Code gives a debtor in possession the rights, powers, functions and duties of a chapter 11 bankruptcy trustee.").

[9] The above-referenced anti-alienation statute, i.e., 11 U.S.C. § 541(c)(1), states in part that "an interest of the debtor in property becomes property of the estate . . . notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law . . . that is

The Debtor's corporate authority to commence this Chapter 11 case is closely analogous to that of the debtor in *In re Energy Drilling Services, id.,* wherein Judge Applebaum denied a motion to dismiss for lack of corporate authority. *See above.* Other courts have similarly denied motions to dismiss for lack of authority under similar circumstances. *See e.g., In re Solomons One*, LLC, 2013 WL 5934656 (Bankr. D. Md. 2013) (where issue was whether the majority equity holder had the authority to file for bankruptcy, or whether unanimous consent was necessary, the court denied a motion to dismiss, holding that "the operating agreement sets forth a reasonable and sound governance agreement that dictates majority rule on all matters other than one which changes the nature of the Debtor, leads to its termination or changes the original agreement among the members as to how they would conduct the affairs of the Debtor," finding that the bankruptcy filing did none of those things); *In re East End Development, LLC*, 491 B.R. 633 (Bankr. E.D.N.Y. 2013) (although debtor's chapter 11 plan would liquidate the company through a bankruptcy sale and liquidating required unanimous consent, court found that the LLC agreement did not require the non-managing member's consent to the chapter 11 filing and denied

---

conditioned on the . . . commencement of a case under this title . . . and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property." As demonstrated by the case law cited by the Movant, Section 541(c)(1) is relevant in situations where a debtor is a member or shareholder in a non-debtor entity, and the members of the non-debtor entity seek to disassociate or alienate the debtor from the non-debtor entity due to the commencement of debtor's bankruptcy. That issue is not present in this case.

motion to dismiss); *In re The Northwest Company*, 2020 WL 2121269 (Bankr. S.D.N.Y. May 1, 2020) (court denied an LLC member's motion to dismiss Chapter 11 initiated by the manager, applying North Carolina LLC act that does not expressly reserve a bankruptcy filing to the members, and where statute did not restrict the manager's authority to act on the LLC's behalf only as to "ordinary course" matters).[10]

The Motion's own cited authority for the standard governing authority to institute a Chapter 11 bankruptcy proceeding actually supports the Debtor's authority in this case. Movant cites to *Price v. Gurney*, 324 U.S. 100, 106 (1945) for the proposition that "[w]henever a court finds that those who purport to act on behalf of the corporation have not been *granted authority by local law to institute the proceedings*, it has no alternative but to dismiss the petition." *See* Motion at ¶40 (emphasis added). In this case, the Debtor's President *was explicitly* "granted authority by local law to institute the proceedings." *See also* **Exhibit B** at p.6, ¶6.2(9). Movant also states that "this case is no different" than the case of *In re*

---

[10] As an aside, while not relevant to the Motion or this Objection, the Movant incorrectly suggests in the Motion that if the President of the Debtor has the authority to commence this proceeding pursuant to the AROA, then somehow "one could surmise that the Nicholson family could file a bankruptcy on behalf of [Eton Street Brewery Real Estate, LLC ("ESBRE")] without unanimity and move to reject the lease with the Debtor". *See* Motion at ¶45, fn.2. This is incorrect. Section 6.2 of Debtor's AROA broadly empowers the President "to do all things necessary or convenient to carry out the Company's business and affairs, including the power to . . . (9) begin, prosecute, or defend any proceeding in the Company's name . . . ." No similar provision exists in the ESBRE Operating Agreement.

*ComScape Telecommunications, Inc.*, 423 B.R. 816, 830 (Bankr. S.D. Ohio 2010). However, in that case, a director who purported to have authority to file a bankruptcy petition for multiple debtors *had validly been removed as director prior to such action* – an entirely different scenario then the case at hand. *See id.* at 835 – 838. Bonnie LePage was indisputably the current President at the time of filing the bankruptcy petition, and empowered to do so under the AROA. This case is much more like the case of *In re Energy Drilling Services,* as discussed above, where the moving party made the same argument that Movants made, and the court in that case denied the motion to dismiss based on the plain language of the operating agreement. *See id.* at p.17.

Because this case was filed with the requisite corporate authority, the Motion should be denied.

**B.** **MOVANTS FALL FAR SHORT OF ESTABLISHING ANY BASIS FOR DISMISSAL PURSUANT TO 11 U.S.C. § 1112(B) "FOR CAUSE" OR FOR "BAD FAITH"; DEBTOR'S CASE WAS CLEARLY FILED IN GOOD FAITH AND IS COMPLIANT WITH ALL BANKRUPTCY CODE REQUIREMENTS**

The Movants also request that this Court dismiss this case pursuant to 11 U.S.C. § 1112(b) either "for cause" or for lack of "good faith." *See* Motion at ¶¶ 48-51. However, Movants fail to meet the burden under applicable law for such relief, which must be denied.

First, Movants appear to request dismissal "for cause" under Section 1112(b)(4), citing to 1112(b)(4) "(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; [and] (M) inability to effectuate substantial consummation of a confirmed plan." Movants then state that "[i]n this case, the Debtor's sole purpose is to sell itself to the LePage family to the detriment of the Nicholson family. The Debtor has no viable means or intent for reorganization." Motion at ¶49. In conclusory fashion, Movants complete this thought by stating that "Plainly stated, there is no reason for this Bankruptcy Case to continue and dismissal is warranted under the circumstances." Motion at ¶49. First, with respect to Section 1112(b)(4)(A), because there is no "substantial or continuing loss to or diminution of the estate," nor is any alleged,[11] the latter portion of that provision, *i.e.,* "and the absence of a reasonable likelihood of rehabilitation" is not applicable (nor, even if it was, does "rehabilitation" in that context mean the same thing as "reorganization"). Second, with respect to Section 1112(b)(4)(M) and the alleged "inability to effectuate substantial consummation of a confirmed plan," that factor is also not applicable, as this speaks to situations where a Debtor has already confirmed a plan but is unable to achieve substantial consummation of the confirmed plan. *See* 7 *Collier on Bankruptcy*, at ¶ 1112.04[6][m]. But even

---

[11] In fact, the Movants stress that the Debtor is cash flow positive and profitable. *See* Motion at ¶¶ 11, 30, 31, and 46.

assuming arguendo that the Debtor's "means or intent for reorganization" (Motion at ¶49) was a factor for a dismissal "for cause," first, nothing in Section 1191 (nor Section 1129 for that matter) requires that a plan be a plan of "reorganization", and second, the Debtor in fact has every ability in this case to confirm a plan pursuant to Section 1191, *i.e.,* a plan to distribute the assets of the estate. Movants make no attempt to explain why such a plan could not be proposed, confirmed or substantially consummated by the Debtor. In short, Movants fail to establish any basis for a dismissal "for cause" under Section 1112(b)(4).[12]

The Movants then allege that the Bankruptcy Case was filed "in bad faith" and therefore should be dismissed "for cause". First, they argue that the Bankruptcy Case is "nothing more than a two-party dispute between the LePage family and the Nicholson family over issues that are already being litigated in the Oakland County

---

[12] Of course, Bankruptcy Courts routinely confirm plans of liquidation in Chapter 11 cases. *See, e.g., In re Crowley, Milner & Co.*, 299 B.R. 830, 833 (Bankr. E.D. Mich. 2003) (referencing earlier confirmed amended joint Chapter 11 plan of liquidation); *In re St. James Nursing & Physical Rehab. Ctr., Inc.*, 645 B.R. 220, 229 (Bankr. E.D. Mich. 2022) (referencing earlier confirmed first amended combined Chapter 11 plan of liquidation); *In re Energy Conversion Devices, Inc.*, 634 B.R. 537, 538 (Bankr. E.D. Mich. 2021) (referencing earlier confirmed Chapter 11 liquidation plan); *In re Cherry Growers, Inc.*, 595 B.R. 882, 884 (Bankr. W.D. Mich. 2018) (referencing earlier confirmed first amended Chapter 11 plan of liquidation); *In re Cmty. Mem'l Hosp. Chapter 11*, No. 12-20666, 2012 WL 13330937 (Bankr. E.D. Mich. Mar. 9, 2012) (confirming first amended Chapter 11 plan of liquidation); *In re Noble Int'l, Ltd.,* No. 09-51720-MBM, 2009 WL 8519710, at *8 (Bankr. E.D. Mich. Apr. 15, 2009) (confirming first amended joint Chapter 11 plan of liquidation); *In re Double G Ranch, LLC*, No. 10-53029, 2009 WL 10818851, at *2 (Bankr. E.D. Mich. Nov. 24, 2009) (confirming first amended combined Chapter 11 plan of liquidation); *In re Checker Motors Corp.*, No. 09-00358, 2011 WL 2746634, at *7 (Bankr. W.D. Mich. Mar. 31, 2011) (confirming Chapter 11 plan of liquidation with modifications).

Circuit Court" (Motion, ¶50).[13]  Again, the Movants base this, and many of their other arguments, on the false equivalence of their state court collection proceeding and this Bankruptcy Court proceeding.  The state court proceeding is a collection action against the Debtor by a single creditor, seeking a judgment in the amount of over $8,000,000, which renders the Debtor insolvent.  The Movants' action also seeks the appointment of a receiver to take unfettered control over the Debtor's assets, liquidate them, and distribute those assets to that single creditor.  This Bankruptcy Court proceeding, on the other hand, seeks to conduct an orderly, going concern, competitive sale process to maximize the value of the Debtor's assets on a going concern basis, thereby preserving the Debtor's operations and the jobs of its over 100 employees, and ensuring a fair and transparent liquidation of the assets for the benefit of all creditors, including Chase Bank, its secured creditor.  Furthermore, as discussed above, the existence of an alleged "two-party dispute" in and of itself does not present a showing of bad faith.[14]

---

[13] As further discussed below in this Brief, the Movants fail to make any showing of bad faith that would constitute grounds for relief from stay or dismissal.  For one, the fact that a bankruptcy case involves a two-party dispute does not, by itself, indicate bad faith.  Other strong indicia of bad faith must be present. *See e.g., Matter of Hulse*, 66 B.R. 681, 683 (Bankr. M.D. Fla. Nov. 6, 1986) (holding a petition designed with the legitimate interest to protect the business and jobs of employees was not a bad faith filing even though the case was essentially a two-party dispute).

[14] *See* pp. 6-7 discussing two-party disputes.

The Movants' *only* authority cited for this section of their Motion makes this point very clearly, when that court denied a similar request to dismiss a Chapter 11 case, pointing out that "[if] these cases were dismissed, assets might disappear and there would be a race to the courthouse with these movants in the lead." *See In re Gucci*, 174 B.R. 401, 411 (Bankr. S.D.N.Y 1994).[15]

Next, they argue that the case was filed without proper authority (Motion, ¶51), repeating the argument separately made elsewhere in the Motion, which has been addressed above, demonstrating that this case was filed with the requisite authority. *See* pp. 8-19 above.

The Movants next argue, as an alleged basis for a bad faith dismissal, that this case was filed "on the eve of determination" by the state court of the Movants request for a money judgment against the Debtor via a motion for summary disposition. *See* Motion at ¶51. The Movant provides no explanation or authority as to why this would meet the requirements for a bad faith dismissal, nor does it.

> The necessary and intended effect of bankruptcy in almost every case is to delay or frustrate the ability of creditors to exercise their rights against the debtor. By operation of the automatic stay of section 362(a), virtually all collection activity is enjoined during the pendency of the case.

---

[15] In the *In re Gucci* opinion, the court denied the creditors' motion to dismiss on bad faith grounds notwithstanding evidence in that case that the individual Chapter 11 debtor's "pre-filing behavior [was] far from exemplary." *Id.* No such behavior exists in the case at bar, nor is there any risk of assets "disappearing" in the event of a dismissal, however, the risk that the Movants would be the only winners in the event of a dismissal, possibly winning their "race to the courthouse," is equally present in this case.

Because the automatic stay is an important incident of the bankruptcy filing, the bare fact that the debtor desires to obtain the benefits of this element of bankruptcy relief cannot by itself support a finding of bad faith. Rather, the debtor must intend to obtain the benefit of the automatic stay for an improper purpose, such as merely to frustrate the rights of creditors rather than to reorganize or to have an orderly liquidation.

7 *Collier on Bankruptcy* ¶1112.07[5][b] (Richard Levin & Henry J. Sommers eds., 16th ed.), *citing, inter alia, Shapiro v. Wilgus*, 287 U.S. 348, 356-57 (1932) (Supreme Court dismissed a Federal receivership where owner created a new company, transferred all his business assets to that company, and then days later filed a complaint to put that company into a Federal receivership) and *First Nat'l Bank of Sioux City v. Kerr (In re Kerr)*, 908 F.2d 400, 404 (8th Cir. 1990) (to determine bad faith, a court "must require a pattern of concealment, evasion, and direct violations of the Code or court order which clearly establishes an improper motive before allowing dismissals for bad faith.")

In this case, the Debtor commenced this Chapter 11 precisely to ensure that it could first, protect the going concern value of its assets from a creditor seeking to at best severely disrupt but more likely shut down its operations, and second, conduct an orderly sale process. The case was not filed as a stall tactic or for any other reason that might be argued to be bad faith.

Movants also state that "there is no reasonable basis for belief that a reorganization is conceivable." *See* Motion at ¶51. This is a repetition of its earlier argument made in the context of a "for cause" dismissal under Section 1112(b)(4) and has already been addressed by the Debtor – the Debtor has every ability to

confirm a plan in this Bankruptcy Case pursuant to the Bankruptcy Code. *See* above at pp. 20-21.

Next, the Movants state, in apparent support of dismissal for bad faith, that the Debtor has proposed a sale to a stalking horse bidder that is an insider. As this Court recognized at the hearing on the Debtor's Motion for Sale of Property under Section 363(b) (Dkt. No. 15), "there are many, many cases that say there's no problem with an insider being the stalking horse bidder. No problem with it." *See* **Exhibit A**, excerpt from Transcript for August 13, 2024 Hearing, pp. 58-59.

The Movants then state that "the Debtor had ample opportunity to litigate the matters presented to this Court" in the state court proceeding but instead "Debtor has attempted to use this Court as its personal appellate court in a brazen attempt at forum shopping." Again, Movants base their argument on the false premise that somehow the state court collection action against the Debtor is a proceeding similar to a Chapter 11 bankruptcy proceeding, which is plainly wrong. The only matter that was being litigated against the Debtor in that proceeding was the liability on the Movants' unsecured Note. And the only relief that the state court could grant against Debtor, should the Movants have prevailed, would be to enforce their judgment creditor remedies against the Debtor. As stated above, that scenario is perhaps the most common *precursor* to the filing of a bankruptcy proceeding – not it's equivalent.

25

Finally, the Movants end with the purely conclusory statement that "the Debtor is abusing the integrity of the bankruptcy system as a whole and demonstrably attempting to cause harm to the Trusts through the filing of the Bankruptcy Case." The Movants fail to offer any factual or legal argument to support its conclusory allegations, and clearly do not meet the standard for a dismissal for bad faith.

In summary, for the reasons set forth above, the Movants fail to establish that a dismissal under Section 1112 is warranted in this case.

## V. THE MOTION'S REQUEST FOR PERMISSIVE OR MANDATORY ABSTENTION AND RELATED RELIEF FROM THE AUTOMATIC STAY MUST BE DENIED, BECAUSE THE MOTION DOES NOT REQUEST ABSTENTION OF ANY PARTICULAR MATTER, BUT RATHER "ABSTENTION" FROM THE ENTIRE BANKRUPTCY CASE WHICH CANNOT BE GRANTED

In the Motion, Movant first requests dismissal of the entire Bankruptcy Case, as discussed above, which request this Court should deny. The Movant then seeks alternative relief, *i.e.*, that the Court generally abstain from the entire Bankruptcy Case, and grant relief from the automatic stay in conjunction therewith. *See* Motion at ¶¶52-111. Such relief is simply not available.

### A. MOVANTS' REQUEST TO PERMISSIVELY OR MANDATORILY ABSTAIN FROM THE ENTIRE BANKRUPTCY IS IMPROPER AND MUST BE DENIED

28 U.S.C. § 1334(a) gives original and exclusive jurisdiction over bankruptcy cases to district courts, which is then automatically referred to bankruptcy courts

26

pursuant to Eastern District of Michigan Local Rule 83.50(a). Notwithstanding such jurisdiction, Bankruptcy Courts may decide to abstain from hearing particular matters pursuant to 28 U.S.C. § 1334(c), either permissively or mandatorily.

"Permissive abstention" is governed by 28 U.S.C. § 1334(c)(1), which provides that nothing prevents the court "in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing *a particular proceeding* arising under title 11 or arising in or related to a case under title 11" (*i.e.*, "core" matters, such as a contested claim matter) (emphasis added).[16]

"Mandatory abstention" is governed by 28 U.S.C. § 1334(c)(2), which provides *inter alia* that a court *must* abstain from hearing matters that are merely related to, but not arising under or arising in (*i.e.,* "non-core" matters) "[u]pon timely motion of a party *in a proceeding,*" if the state court case had no other basis for

---

[16] For context, a common scenario where permissive abstention is granted is when a creditor asks the court to abstain from hearing the liability phase of a contested claim and/or non-dischargeability action. Courts have granted such request directing that the liability phase be heard in a pre-petition, pending state court action and reserving for itself the final determination of claim allowance in the bankruptcy case and/or whether any of the liability is dischargeable. *See, e.g., Gedeon v. Ballet Academy of Pittsburgh, Inc.* (*In re Piper*), 548 B.R. 426 (Bankr. W.D. Pa. 2016). *See also In re Purina Mills, Inc.*, No. 99-3938-SLR, 2002 WL 125677, at *1 (Bankr. D. Del. Jan. 28, 2002) (granting permissive abstention from hearing state law claims for breach of contract and violations of the Texas Deceptive Trade Practices and Consumer Protection Act but noting further that the bankruptcy court would retain jurisdiction to determine if any resulting judgments were administrative claims) (unpublished opinion). Obviously, that is a completely different scenario than the matter at hand, where the Movant requests that the Court "abstain" from the entire Bankruptcy Case. However, at a future stage of this case, the Movant could decide to request permissive abstention with respect to its claim, i.e., the adjudication of liability and the amount of the claim. Such a request, however, has not been made, and furthermore, would be premature at this time, because the Movant has not yet even filed a proof of claim, much less received an objection to it from the Debtor.

jurisdiction other than Section 1334 "related to" jurisdiction, and if the state court action has been commenced and can be timely adjudicated (emphasis added).[17]

One can stop there in the analysis with respect to the Motion's request for either permissive or mandatory abstention. The Movant fails to identify any particular proceeding to which this Court could grant abstention with respect to. The Movants' request is simply a blanket request for this Court to abstain from hearing anything in the Bankruptcy Case. That is a request for relief pursuant to 11 U.S.C. § 305 (*see* Section III of this Brief, above), not 28 U.S.C. § 1334(c)(1). *See e.g.*, 2 *Collier on Bankruptcy* ¶3.05[1] (Richard Levin & Henry J. Sommers eds., 16th ed.) ("the power to abstain under section 1334(c)(1) does not deal with the power to abstain from entertaining and acting in the title 11 case proper. That is the subject of section 305 of the Code"); *see also In re Andrus,* 338 B.R. 746, 751 (Bankr. E.D. Mich. 2006) ("By its terms, § 305(a) applies to entire cases or all proceedings in a case, not particular proceedings in a case[.]")

---

[17] For additional context, a common scenario where mandatory abstention could apply is when a bankruptcy debtor files a non-core adversary proceeding to collect money from a vendor or other party that owes the debtor money when there is already a state court action that had been commenced pre-petition and then stayed. In those circumstances, a court might hold that the action could be timely adjudicated in the pre-existing state court action and abstain from hearing the adversary proceeding. See e.g., *In re Atlas Automation, Inc.*, 42 B.R. 246 (Bankr. E.D. Mich. 1984). Obviously, that is a completely different scenario than the matter at hand.

## B. REQUEST FOR RELIEF FROM AUTOMATIC STAY RELATED TO ABSTENTION NOT WARRANTED

28 U.S.C. § 1334(d) states, *inter alia*, that an abstention order shall not be construed to limit the applicability of the automatic stay as it applies to property of the estate. So, if property of the estate is impacted by the underlying state court litigation related to the abstention, the party seeking abstention also must obtain relief from the automatic stay with respect to that particular proceeding, and will need to show "cause" for lifting the stay.

For the reasons discussed above, because abstention cannot be granted, any related request for relief from the stay is moot. The Debtor will address the Movants' stand-alone request for relief from the automatic stay in the next section of its Objection.

## VI. MOTION FOR RELIEF FROM THE AUTOMATIC STAY "FOR CAUSE" SHOULD BE DENIED BECAUSE MOVANT FAILS TO MAKE ANY SHOWING OF CAUSE

In the Motion, Movant first requests dismissal of the entire Bankruptcy Case pursuant to either Section 305 or Section 1112, and then seeks alternative relief, *i.e.*, that the Court generally abstain from the entire Bankruptcy Case pursuant to 28 U.S.C § 1334(c), and grant relief from the automatic stay in conjunction therewith. As discussed above, the Motion's requests for dismissal or abstention in the alternative should be denied. Finally, the Movants also request, as a third alternative,

29

that the Court lift the automatic stay "for cause" to allow the state court litigation to continue against the Debtor. This Court should also deny that request because Movants fail to make any showing of "cause".

This Court explained the standard applicable to requests for relief from stay for cause in one of the cases cited by the Movants, *i.e., In re Birmingham Cosmetic Surgery, P.L.L.C.*, 2015 WL 1404296, 3 (Bankr. E.D. Mich. 2015) (denying request for relief from stay as premature, just as in this case, where even limited relief from stay to liquidate a contested unsecured claim would also be premature). The Court stated that:

> The Bankruptcy Code does not define "cause." Instead, courts must determine whether relief is appropriate on a case by case basis. *Chrysler LLC v. Plastech Engineered Products, Inc. (In re Plastech Engineered Products, Inc.)*, 382 B.R. 90, 106 (Bankr. E.D. Mich. 2008) (*citing Laguna Assoc. Ltd. P'ship v. Aetna Cas. & Sur.Co. (In re Laguna Assoc. Ltd. P'ship)*), 30 F.3d 734, 737 (6th Cir. 1994).

*Id*.

This Court went on to hold that the relief from stay request in that case was prematurely requested:

> The Stay Order states "[n]otwithstanding any other provision herein, execution on the insurance policy is stayed." The fact that Debtors did not satisfy all of the conditions of the Stay Order is of no moment: the state court has ruled that Pagan may not collect on the insurance policy pending appeal. As such, lifting the automatic stay before a final determination of Debtors' appeal would serve no purpose and is premature.

*Id*.

One case cited by this Court therein, *i.e., In re Plastech* (also cited by the Movants), is particularly instructive. In *Plastech*, Judge Shefferly denied relief from the stay to Chrysler, preventing Chrysler from taking possession on equipment that it owned that was located on the debtor's premises, even though Chrysler demonstrated that without such equipment that it owned, it would suffer severe economic hardship. *Id.* at 111. *Plastech* stands in stark contrast to the case at bar, where the Movants seek relief from the stay to continue a state court action against the Debtor to obtain and enforce a monetary judgment for an unsecured claim, through the appointment of a state court receiver over all of the Debtor's assets, which would then directly conflict with the powers of this Bankruptcy Court. Even with a far greater showing of potential harm to the movant by Chrysler (in this case, Movants can demonstrate no harm whatsoever), the court in *Plastech denied* relief from the stay, because such relief would interfere with the debtor's bankruptcy case, which also resulted in a Section 363 sale of its assets to preserve its going concern value.[18]

Throughout the Movants' request for relief from the stay for cause, as well as in the other sections of its Motions, the Movants make numerous conclusory

---

[18] "On June 19, 2008, the Court entered an order (docket entry # 1837) approving the sale of the Debtor's interior business. On June 23, 2008, the Court entered an order (docket entry # 1920) approving the sale of the Debtor's exterior business. Together, these two orders approved the sale of substantially all of the Debtor's business assets." *In re Plastech Engineered Products, Inc.,* 418 B.R. 235, 239 (Bankr. E.D. Mich. 2009).

31

statements that the Bankruptcy Case was filed "in bad faith" or variations on that theme, without making any factual or legal argument that would support its conclusory obligations. While a finding of bad faith can be grounds for relief from stay for cause, the Movants fail, just as the movants did in another case heavily cited by the Movants, *In re Sonnax*, 907 F.2d 1280 (2nd Cir. 1990).

> Tri Component cannot avail itself of the second factor because it has failed to show bad faith. Tri Component relies on *In re Little Creek Development Co.*, 54 B.R. 510 (Bankr.N.D.Tex.1985), in contending that Sonnax's filing of the bankruptcy petition "to obtain relief which the party could not obtain in a state court judicial proceeding constitutes bad faith." However, although neither party has noted it, the Fifth Circuit reversed the Little Creek decision. *Little Creek Development Co. v. Commonwealth Mortgage Corp. (in re Little Creek Development Co.),* 779 F.2d 1068 (5thCir.1986). *Although conceding that the lack of good faith may constitute cause under Section 362, the court held that a bankruptcy filing intended in part to gain relief from a state-court action does not necessarily constitute bad faith. See id. At 1073. Little Creek stated that a finding of bad faith under Section 362 usually requires a single-asset debtor or the absence of a going concern. See id.* At 1072. Certainly, in such circumstances the bankruptcy filing may have as its only purpose a hope to relitigate a state court action. *In the instant case, however, the state-court injunction, as Tri Component well knew, had the potential of transforming a going concern with other creditors into a dead competitor. So far as can be told on the present record, Sonnax faced the very real threat of being driven out of its market and filed the bankruptcy petition as a last resort.* We conclude that the district court correctly found that Tri Component had failed to carry its burden in showing bad faith as cause for lifting the stay.

*Id*. (emphasis added).

As has been mentioned many times already, this Bankruptcy Case was filed by a Debtor facing extinction through a possible judgment being issued in the near-

term to be followed by a renewed request for a free-fall receivership to be appointed over all of its assets, at best resulting in serious disruption and deterioration of the Debtor's business and going concern value but more likely, in its closure and piecemeal liquidation.

The movants in *Plastech* and *Sonnax* were also denied relief from the stay "for cause" because the actions they sought to continue would *directly* interfere with the Bankruptcy Case, just as the Movants' state court action would in the event that Movants were allowed to pursue their objective of obtaining a receiver over the Debtor's assets. *See id*. at 1286-1287.

Other than for bad faith, which Movants fail to make any showing of beyond mere conclusory statements, relief from the stay "for cause" can also be appropriate in unique circumstances that have been widely discussed in many bankruptcy court opinions, including many of those cited by the Movants. Perhaps the most common unique circumstance is when a creditor has brought non-dischargeable claims against an individual debtor in state court and seeks to adjudicate those claims there, prior to seeking a non-dischargeability judgment from the Bankruptcy Court. *See e.g.,* cases cited by the Movants: *In re Martin*, 542 B.R. 199 (6th Cir. B.A.P. 2015); *In re Curtis*, 40 B.R. 795 (Bankr. D. Ut. 1984); and *In re Garzoni*, 35 Fed. Appx. 179 (6th Cir. 2002). Other unique circumstances are described in two other cases cited by Movants that also are not applicable to the case at bar: *In re ExpressTrak,*

*L.L.C.*, 2004 WL 3735126 (Bankr. E.D. Mich. Jan. 20, 2004) (lifting stay for determination of contract issues necessary to resolve contested matter in bankruptcy case related to Section 365) and *Matter of Holly's, Inc.*, 140 B.R. 643 (Bankr. W.D. Mich. 1992) (denying relief from stay where movant alleged pre-petition mismanagement of the debtor, noting that while in some cases mismanagement could present grounds for relief for cause, in that case the showings of mismanagement did not rise to level necessary to constitute cause). The court in the *Matter of Holly's, Inc.*, listed other unique circumstances that could constitute "cause", none of which exist in this case:

> In previous bench opinions, given certain facts, this court has determined cause may include lack of insurance, commission of waste, failure to pay post-petition taxes respecting the property in which the creditor has an interest, or violation of government statutes or ordinances.

*Id*. at 949.

There are also unique situations where the stay doesn't apply in the first place, like another case cited by the Movants in alleged support of its request that has no applicability to this case. *See Matter of Garrison*, 5 B.R. 256 (1980) (automatic stay does not apply to alimony and child support obligations).

While it is very clear that Movants have failed to demonstrate that cause exists in this case to lift the stay in favor of Movants, Debtor will nevertheless briefly

discuss Movants' various arguments in support thereof stated at ¶¶ 58 – 90 of the Motion.

Movant first claims that three potentially relevant factors mentioned in the *Sonnax* opinion support a showing of cause to lift the stay (*see* ¶¶ 65 – 72 of the Motion) essentially because the state court case is allegedly "duplicative" of the Bankruptcy Case and that the state court case would result in "a complete resolution of the issues" in this Bankruptcy Case. This of course is nonsense. The state court case, with respect to the Debtor, if concluded in favor of the Movants, would result in a money judgment against the Debtor, which the Movant/creditor could then seek to enforce in state court. A one-sided collection effort by a creditor is not a substitute for a Chapter 11 bankruptcy case, which, among other things, allows the Debtor to continue to operate in the ordinary course of business, conduct a competitive sale process to maximize value, and then to conduct an equitable process to distribute the assets of the estate to creditors in their order of priority.

The Movant next claims that two other factors mentioned in the *Sonnax* opinion support a showing for cause to lift the stay (*see* ¶¶ 73 – 80 of the Motion) because they allege that terminating the automatic stay to allow the state court proceedings to continue "will not interfere with the Bankruptcy Case." This also is, of course, nonsense. Allowing the Movant to obtain a judgment in state court and enforce that judgment under state creditor remedy laws would of course run directly

35

in conflict with this Bankruptcy Case. The various rights and remedies of a judgment creditor could run into conflict with every aspect of the case, from the Debtor's right to continue to operate in the ordinary course of business and pursuant to this Court's orders, to being permitted to sell its assets and distribute the proceeds of that sale to creditors.

The Movant next claims that two other factors mentioned in the *Sonnax* opinion support a showing for cause to lift the stay (*see* ¶¶ 81 – 85 of the Motion) because (a) other non-Debtor parties are involved in the state court litigation and (b) a motion for summary disposition was filed by the Movants in the state court case against the Debtor and hence that litigation is at an "advanced stage". First, the Movant is correct that there are other non-Debtor parties that are defendants in the state court action brough by the Movant. The automatic stay does not apply to those non-Debtor defendants, as the Movant knows and has pointed out to this Court. That fact provides no bearing or showing why cause would exist to lift the automatic stay as to the Debtor in *this* case. Second, while the fact that a dispositive motion has been filed and could be ruled on by a state court might be a relevant factor for a court to consider in some cases, in *this* case it does not provide any basis to show that cause exists to lift the automatic stay, for all of the other reasons mentioned above.

Finally, the Movant also claims that one other factor mentioned in the *Sonnax* opinion (*i.e.*, impact of stay on the parties and balancing the harms) supports a

showing for cause to lift the stay (*see* ¶¶ 81 – 85 of the Motion) because they claim that this is not actually a bankruptcy case but only a two-party dispute, "the Debtors strategy in this case is untenable", and that "the Debtor is harming the Trusts by attempting to cause the Trusts [sic] engage in duplicative and costly litigation in the Bankruptcy Court."  As has been argued elsewhere in this response, the fact that there is a primary creditor that may have precipitated the bankruptcy court filing as part of a two-party dispute is not by itself cause to lift the stay (*see* pp. 6-7, *supra*). While it is unclear what "the Debtors strategy in this case is untenable" actually means, the Debtor's intention to conduct a sale of its assets and then distribute those proceeds is entirely tenable.  Finally, as explained above, the Bankruptcy Case is not "duplicative" of the state court proceedings whatsoever.

As the final portion of its argument for relief from the stay for cause, the Movants request waiver of the stay applicable pursuant to Fed. R. Bankr. P. 4001(a)(3).  Because the Movants have failed to present any showing that could entitle them to relief from the stay, no response is necessary with respect to that request, and the Debtor reserves all of its rights in that regard.

## VII.  <u>CONCLUSION</u>

This Court should deny the Motion, and these proceedings should be allowed to continue.  The Debtor's bankruptcy petition was duly authorized by its President, who had the power to initiate this bankruptcy proceeding, which did not require any

37

additional approval by any other member of the Debtor. The Movants have also

failed to provide any other bases for dismissal, abstention, or relief from the stay.

Respectfully submitted,

VARNUM LLP
*Counsel to Debtor*

Dated: September 3, 2024           By:   */s/ Brendan G. Best*
                                         Brendan G. Best (P66370)
                                         480 Pierce Street, Suite 300
                                         Birmingham, Michigan 48009
                                         (313) 481-7326
                                         bgbest@varnumlaw.com

26105244

# Exhibit A

1               UNITED STATES BANKRUPTCY COURT
                EASTERN DISTRICT OF MICHIGAN
2                   SOUTHERN DIVISION

3

   IN RE:                  .   Case No. 24-47188-mar
4                    .   Chapter 11
   ETON STREET BREWERY, LLP,  .   Subchapter V
5                    .
       Debtor.           .
6                    .
   . . . . . . . . . . . . . .
7

8

9

10  **TRANSCRIPT OF MS TEAMS AUDIO CONFERENCE HEARING ON MOTION FOR
      SALE OF PROPERTY UNDER SECTION 363(b) (DOCKET 15)**

11

12          BEFORE THE HONORABLE MARK A. RANDON
            UNITED STATES BANKRUPTCY JUDGE
13

14            TUESDAY, AUGUST 13, 2024
               DETROIT, MICHIGAN

15

16

17

18

19

20

21

22

23

24

25

1   of a conflict" and that he would "coach" the LePages.

2          But that is not anyone with authority over them,

3   and so at a minimum you need to be able to present evidence

4   at the continued hearing.

5          With respect to the scheduling, Your Honor, we

6   have -- we can get our motion on file by Friday.  I'm okay if

7   the Debtor wants 14 days to respond, and then we'll just --

8   the following week I know is Labor Day weekend.  I'm just

9   putting that in the Court's mind.  So we'll just need to find

10  a date at the Court's convenience for our further hearing.

11         THE COURT:  All right.  So what I would suggest,

12  you know, I don't think it needs to be an evidentiary

13  hearing.

14         Now, we can have -- if there's suggestions of bad

15  faith or fraud or anything like that, if it turns out that

16  this stalking horse bid is the winner, or that its group of

17  insiders, even if after over-bid become the winner, then I

18  say the scrutiny takes place.  Then it may benefit everybody

19  to have an evidentiary hearing.

20         But the fact of the matter is at this point, as

21  Mr. Dooley pointed out, a reasonable -- a stalking horse bid

22  in the realm of reasonable is better than a naked bid.  I

23  tend to agree with him there.

24         The only determination that the Court needed to

25  make was is it a reasonable stalking horse bid.  But there

1  are many, many cases that say there's no problem with an
2  insider being the stalking horse bidder.  No problem with it.
3          If they are the eventual purchaser at the sale,
4  then everything needs to be scrutinized because they are an
5  insider and the stalking horse bidder.  But we're not there
6  yet.
7          And so I don't think we need to have an
8  evidentiary hearing, Mr. Crowder if you're not successful
9  after this expedited hearing in getting the case thrown out.
10          I will have some more questions of Mr. Dooley.
11  Maybe we can put him under oath at that time and I will allow
12  you to ask him some questions.
13          But then a decision will be made by this Court as
14  to the propriety of the stalking horse bid.  And it's really
15  a business judgment call at that point.  There is no sort of
16  right to say that the stalking horse bid has to be fair
17  market, or anything like that.  It just has to be something
18  that is going to help the process, frankly.
19          MR. CROWDER:  Your Honor, this is Elliot Crowder
20  again.
21          THE COURT:  Mr. Crowder, it's more important that
22  the sale be open, thorough, as that is likely to generate
23  over bid.
24          And I know that as I determine that the stalking
25  horse bid sets the floor, and so it's important that that be

1    THE COURT: Thank you. Ms. Fish?

2    MS. FISH: I am all set. Thank you, Your Honor.

3    THE COURT: Ms. Rice, anything else?

4    MS. RICE: I would just say that I had requested

5 an appraisal of these assets from the Debtor, and we would

6 like to have access to get that appraisal. I don't know that

7 it needs to be with the other party, but if they're getting

8 an appraisal, as well, we'd be happy to try to arrange it at

9 the same time.

10    THE COURT: Oh, that would be great. And maybe,

11 Ms. Rice, I don't have any problem with you being involved

12 with Ms. Fish and Mr. Dooley to come up with an appraiser.

13 Maybe we can just use one appraisal and save everybody some

14 cash.

15    MS. RICE: Okay. I will check with the bank on

16 that. And just a reminder to all of the parties, we have a

17 secured claim of $2.6 million -- over $2.6 million in these

18 assets.

19    Now, we do have other security because we have a

20 mortgage on the real estate that's owned by the Eton Street

21 Brewery Real Estate Company.

22    But we do have a lien on all of the Debtor's

23 assets. As far as I know, I'm still awaiting final documents

24 from my client.

25    THE COURT: So you're saying if they were the

1  winning bidder, you're getting all of the $2.1 million?  Is

2  that your point?

3          MS. RICE:  That is a possibility, unless there is

4  some other proceedings relating to the real estate.

5          THE COURT:  All right.  Mr. Cataldo, any other

6  questions or comments at this time?

7          MR. CATALDO:  No, Your Honor.

8          MR. KRUGER:  This is Richard Kruger.  Nothing

9  further, Your Honor.  Thank you.

10          THE COURT:  All right.  Thank you.  So we'll do a

11  scheduling order deadline that conforms to what we placed on

12  the record.

13          The threshold issue brief is due on the 19th of

14  August, 5:00 p.m.

15          Response due September 3rd.

16          Hearing September 10th at 11:00 a.m.

17          And depending on the outcome of that hearing, a

18  continuation of this hearing September 17th at 11:00 a.m.

19          And that will be the order.  We'll take it from

20  there.  Thank you very much, everybody.

21          MS. RICE:  Thank you.

22          MR. BEST:  Thank you very much, Your Honor.

23          MR. CROWDER:  Thank you, Judge.

24          MR. CATALDO:  Thank you.

25          THE COURT:  You're welcome.

# Exhibit B

# FIRST AMENDED AND RESTATED
# OPERATING AGREEMENT OF
# ETON STREET BREWERY, LLC
### (a Michigan Limited Liability Company)

This First Amended and Restated Operating Agreement ("Operating Agreement") is made effective the 16th day of December, 2011, among Eton Street Brewery, LLC, a Michigan limited liability company (the "Company"); the persons executing this Operating Agreement as the members of the Company; and all of those who shall later be admitted as members (individually, a "Member," and collectively, the "Members") who agree as follows:

## ARTICLE I

## ORGANIZATION

1.1 **Formation**.  The Company has been organized as a Michigan limited liability company pursuant to the Michigan Limited Liability Company Act, 1993 PA 23, as amended (the "Act"), by the filing of Articles of Organization ("Articles") with the Michigan Department of Consumer and Industry Services as required by the Act on under the name Cole Street Brewery, LLC, May 18, 2011 with the change of its name to Eton Street Brewery, LLC, being endorsed June 9, 2011.

1.2 **Name**. The name of the Company is Eton Street Brewery, LLC.  The Company may also conduct its business under one or more assumed names, including Eton Street Brewery and Griffin Claw Brewing Company.

1.3 **Purposes**.  The purpose of the Company is to engage in any activity for which limited liability companies may be formed under the Act, including organizing, constructing, furnishing and operating brewery, distillery, winery and restaurant businesses.  The Company shall have all the powers necessary or convenient to effect any purpose for which it is formed, including all powers granted by the Act.

1.4 **Duration**.  The Company shall be perpetual unless otherwise stated in the Articles or until the Company dissolves and its affairs are wound up in accordance with the Act or this Operating Agreement.

1.5 **Registered Office and Resident Agent**.  The Registered Office and/or Resident Agent may be changed from time to time. Any such change shall be made in accordance with the Act. If the Resident Agent resigns, the Company shall promptly appoint a successor.  The original registered office was at 2855 Coolidge Highway, Suite 203, and the resident agent is John B. Carlin, Jr.  Concurrent with this document being executed the registered agent shall be Mark Papak, and the registered office shall be at c/o Blackwell, Inc., 2051 Villa Road, Suite 103, Birmingham, MI 48009.

1.6 **Intention for Company**. The Members have formed the Company as a limited liability company under the Act. The Members specifically intend and agree that the Company not be a partnership or any other venture, but a limited liability company under and pursuant to the Act. No Member or Manager shall be construed to be a partner in the Company or a partner of any other Member, Manager, or person, and the Articles, this Operating Agreement, and the relationships created by and arising from them shall not be construed to suggest otherwise.

## ARTICLE II

## BOOKS, RECORDS, AND ACCOUNTING

2.1 **Books and Records**. The Managers shall maintain complete and accurate books and records of the Company's business and affairs as required by the Act. The Company's books and records shall be kept at the Company's Registered Office or such other place as the Members approve.

2.2 **Fiscal Year; Accounting**. The Company's fiscal year shall be the calendar year. The particular accounting methods and principles to be followed by the Company shall be selected by the Managers from time to time.

2.3 **Reports**. The Managers shall provide to the Members, in the time, manner and form that the Members determine, reports concerning the financial condition and results of operation of the Company and the Members' Capital Accounts. Such reports shall be provided at least annually, as soon as practicable after the end of each calendar year, and shall include a statement of each Member's share of profits and other items of income, gain, loss, deduction, and credit.

2.4 **Member's Accounts**. The Company shall maintain separate Capital Accounts for each Member. Each Member's Capital Account shall reflect the Member's capital contributions and increases for the Member's share of any net income or gain of the Company. Each Member's Capital Account shall also reflect decreases for distributions made to the Member and the Member's share of any of the Company's losses and deductions.

## ARTICLE III

## CAPITAL CONTRIBUTIONS

3.1 **Initial Commitments and Contributions**. By executing this Operating Agreement, the initial Members agree to make the capital contribution set forth in attached Exhibit "A". Each Member's interests in the total capital of the Company (a Member's "Sharing Ratio," as adjusted from time to time to reflect changes in the Capital Accounts of the Members and the total capital in the Company) are also set forth in Exhibit "A" including those of additional Members as they may be added to the Company. Any additional Member (other than an assignee of a membership interest who has been admitted as a Member) shall make the capital contribution set forth in an

Admission Agreement, unless otherwise agreed by all Members. No interest shall accrue on any capital contribution.

3.2 **Additional Contributions**. In addition to the initial capital contributions, the Managers may determine from time to time that additional capital contributions are needed to enable the Company to conduct its business and affairs. After making such a determination, notice of it shall be given to all Members in writing at least ten (10) business days before the date on which the additional contributions are due. The notice shall describe in reasonable detail the purposes and uses of the additional capital, the amounts of additional capital required, and the date by which payment of the additional capital is due. Each Member shall be obligated to make additional capital contributions to the extent of any unfulfilled commitment. Any Member who has fulfilled the Member's commitment has the right, but not the obligation, to make any additional capital contributions needed, according to that Member's Sharing Ratio.

3.3 **Failure to Contribute**. If a Member fails to make a capital contribution, for which the written commitment has been made, when required, the Company may, in addition to pursuing any other rights and remedies the Company may have under the Act or applicable law, take any enforcement action (including the commencement and prosecution of court proceedings) against the Member that the Managers consider appropriate. Moreover, the remaining Members may elect to contribute the required capital themselves, according to their respective Sharing Ratios. The Members who make such contributions shall be entitled to treat these amounts as an extension of credit to the defaulting Member, payable on demand, with interest accruing on the extension at the rate of seven percent (7%) per annum until paid. This extension of credit shall be secured by the defaulting Member's interest in the Company. Each Member who defaults grants to each Member who may later make an extension of credit a security interest in the defaulting Member's interest in the Company.

3.4 **Withdrawal Prohibited**. No Member shall have any right or be permitted to withdraw as a member under any circumstances.

# ARTICLE IV

## ALLOCATIONS AND DISTRIBUTIONS

4.1 **Allocations**. Except as may be required by the Internal Revenue Code of 1986, as amended, or by this Operating Agreement, the Company's net profits, net losses, and other items of income, gain, loss, deduction, and credit shall be allocated among the Members in accordance with each Member's Sharing Ratio.

4.2 **Distributions and Other Disbursements**. After the payment of Minimum Rent (as called for in its Lease with Eton Street Brewery Real Estate) and other operating expenses, the Company may make disbursements to the Members from time to time, at the discretion of the Members, in the following order of priority:

a. <u>Income Tax Distributions.</u> Distribution will be made to the two Members, Mary E. Nicholson Trust UAD 1/14/1988, as amended ("MEN Trust"), and Bonnie J. LePage Trust UAD 3/17/1997, as amended ("BJL Trust"), in a sufficient amount to pay for each of their Michigan and Federal income taxes which result from income from the Company each year; the amount of tax will be calculated at the then current highest marginal rates each year, multiplied by that Member's taxable income attributable to the Company's activities;

b. <u>Shortfalls Causing a Reduction in RMI Fee.</u> If RMI's management fee is partially reduced or fully discontinued as a result of Shortfall(s) in the minimum interest owed on the $11,000,000 and $6,000,000 debts, as defined in a certain Capital Funding Agreement dated December 16, 2011, each of BJL Trust and MEN Trust shall be entitled to a distribution equal to the reduced or discontinued management fee, annually. Such equal distributions shall be made upon the written request of either member.

c. <u>Rent</u>. Rent payments of the minimum amount shall be made from the Company to Eton Street Brewery Real Estate, LLC pursuant to its Lease Agreement including make additional Mortgage Principal reductions on Landlord's financing as are feasible;

d. <u>Secured Promissory Note.</u> Payment will be made to MEN Trust and BJL Trust, as equal holders, on the Company's Secured Promissory Note(s);

e. <u>Balance</u>. Additional available cash will be used as follows:

(i) <u>Additional Rent</u>: Seventy-five (75%) percent to make payments of Additioanl Rent pursuant to the Lease with Eton Street Brewery Real Estate, LLC to be applied against Landlord's mortgage; and

(ii) Twenty-five (25%) percent as a distribution to the Members based on their Sharing Ratios.

Distributions may be made from available cash only after the Members determine, in their reasonable judgment, that the Company has available cash that is cash on hand exceeding the Company's current and anticipated needs (including operating expenses, outside debt service, acquisitions, reserves and mandatory payments, if any). All distributions made on account of a membership interest shall be made to the Members in accordance with each Member's Sharing Ratio. Distributions shall be in cash or property, or both, as the Managers determine. No distribution shall be declared or made if, after giving it effect, (a) the Company would not be able to pay its debts as they became due in the usual course of business, or (b) the Company's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the Company were to be

dissolved at the time of the distribution, to satisfy on dissolution the preferential rights of other Members that are superior to the rights of the Members receiving the distribution.

## ARTICLE V

## MEETINGS OF MEMBERS

5.1 **Voting**. All Members shall be entitled to vote on any matter submitted to a vote of the Members. The Members shall have the right to vote on all of the following: (1) the dissolution of the Company pursuant to this Operating Agreement (2) the merger of the Company, (3) an amendment to the Articles; (4) a transaction with the Company or a transaction connected with the conduct or winding up of the Company in which a Company Manager has a direct or indirect interest, or a Manager's personal use of Company property; and (5) the sale, exchange, lease, or other transfer of all or substantially all of the Company's assets other than in the ordinary course of business.

5.2 **Required Vote**. Unless a greater vote is required by the Act or the Articles, the affirmative vote of a majority of the Sharing Ratios of all the Members entitled to vote on such matter is required.

5.3 **Meetings**. An annual meeting of Members for the transaction of such business as may properly come before the meeting shall be held at the time, date, and place that the Managers shall determine. Special meetings of Members for any proper purpose or purposes may be called at any time by the Managers or the holders of at least ten percent (10%) of the Sharing Ratios of all Members entitled to vote. The Company shall deliver or mail written notice stating the date, time, place and purpose(s) of any meeting to each Member entitled to vote at the meeting. The notice shall be given not less than ten (10) (or more than sixty (60) days before the meeting date. All meetings of Members shall be presided over by a Chairperson, designated by the Manager.

5.4 **Consent**. Any action required or permitted to be taken at an annual or special meeting of the Members may be taken by consent or approval without a meeting or prior notice. The consent or approval must be in writing, set forth the action to be taken, and be signed by the Members having at least the minimum number of votes necessary to authorize or take such an action at a meeting at which all membership interests entitled to vote on the action are present and voting. Every written consent or approval shall also bear the date of when each Member signed the consent. Prompt notice of the taking of action without a meeting by less than unanimous written consent of the Members entitled to vote shall be given to all Members who did not consent to or approve the action.

## ARTICLE VI

## MANAGEMENT

6.1     **Management of Business.**

(a)     <u>Manager/President</u>.  The Company shall be managed by two persons ("Managers").     The Members shall determine each Manager's terms, duties, compensation and benefits, of any.  The Managers shall serve at the will and pleasure of the Members.  The Managers of the Company shall be Bonnie J. LePage, and she shall additionally be given the title of President, and Mary E. Nicholson, and she shall additionally be given the title of Vice-President.  Further, either Member may engage affiliated organizations in which she has an interest, such as Restaurant Management, Inc., to perform services to the Company.

(b)     <u>Secretary-Treasurer</u>.  In addition to the Manager/President Vice-President there may be accorded a person the title of Secretary-Treasurer who shall have the duties and responsibilities customarily attributed to those positions in corporate entities.  The Secretary-Treasurer shall be appointed by and serve at the pleasure of the Members.  The first Secretary-Treasurer shall be MARK PAPAK.

(c)     <u>Duties and Responsibilities</u>.  The named officers shall perform the duties and have the responsibilities of similarly titled officers in a corporation, except as modified by the provisions of this Agreement.

6.2     **General Powers of Managers**.     Except as may otherwise be provided in this Operating Agreement, the ordinary and usual decisions concerning the business and affairs of the Company as customarily performed by an organization's president shall be made by the Company's President.  The President has the power, on behalf of the Company, to do all things necessary or convenient to carry out the Company's business and affairs, including the power to (1) purchase, lease, or otherwise acquire any real or personal property, (2) sell, convey, mortgage, grant a security interest in, pledge, lease, exchange, or otherwise dispose of or encumber any real or personal property; (3) open one or more depository accounts and make deposits into, write checks against, and make withdrawals against such accounts, (4) borrow money and incur liabilities and other obligations; (5) enter into any and all agreements and execute any and all contracts, documents, and instruments; (6) engage employees and agents and define their respective duties and compensation, (7) establish pension plans, trusts, profit-sharing plans, and other benefit and incentive plans for Members, employees, and agents of the Company; (8) obtain insurance covering the business and affairs of the Company and its property, and on the lives and well-being of its Members, employees, and agents; (9) begin, prosecute, or defend any proceeding in the Company's name; and (10) participate with others in partnerships, joint ventures, and other associations and strategic alliances.

6.3     **Limitations**.  Notwithstanding any other provision of this Operating Agreement, no act shall be taken, sum expended, decision made, obligation incurred, or power exercised by any Manager on behalf of the Company, except by the unanimous consent of all Members, with respect to (1) any significant and material purchase, receipt,

lease, exchange, or other acquisition of any real or personal property or business; (2) the sale of all or substantially all of the assets and property of the Company; (3) any mortgage, grant of security interest, pledge, or encumbrance on all or substantially all of the assets and property of the Company; (4) any merger; (5) any amendment or restatement of the Articles or this Operating Agreement; (6) any matter that could result in a change in the amount or character of the Company's capital; (7) any change in the character of the business and affairs of the Company; (8) the commission of any act that would make it impossible for the Company to carry on its ordinary business and affairs; or (9) any act that would contravene any provision of the Articles, Operating Agreement, or the Act.

6.4  **Standard of Care; Liability**.Every Manager shall discharge his or her duties as a manager in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner the Manager reasonably believes to be in the best interests of the Company. A Manager shall not be liable for any monetary damages to the Company for any breach of such duties except for (1) receipt of a financial benefit to which the Manager is not entitled; (2) voting for or assenting to a distribution to Members in violation of this Operating Agreement or the Act; or (3) a knowing violation of the law.

# ARTICLE VII

## EXCULPATION OF LIABILITY; INDEMNIFICATION

7.1  **Exculpation of Liability**.  Unless otherwise provided by law or expressly assumed, a person who is a Member shall not be liable for the acts, debts, or liabilities of the Company.

7.2  **Indemnification**.  Except as otherwise provided in this Article, the Company shall indemnify any Member, and may indemnify any Manager, employee or agent, of the Company who was or is a party, or is threatened to be made a party, to a threatened, pending, or completed action, suit, or proceeding (whether civil, criminal, administrative, or investigative and whether formal or informal), other than an action by or in the right of the Company, where such person is a party because the person is or was a Member, Manager, employee, or agent of the Company. The Company shall indemnify such Member, Manager, employee or agent against expenses, including attorney fees, judgments, penalties, fines, and amounts paid in settlement, actually and reasonably incurred by such person in connection with the action, suit, or proceeding. The Company shall indemnify the Member, Manager, employee, or agent if the person acted in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner that the person reasonably believed to be in the best interests of the Company. With respect to a criminal action or proceeding, the person must have had no reasonable cause to believe that his or her conduct was unlawful. To the extent that a Member, Manager, employee, or agent of the Company has been successful on the merits or otherwise in defense of an action, suit, or proceeding, or in defense of any claim, issue, or other matter in the action, suit, or proceeding, such person shall be indemnified against actual and reasonable expenses, including attorney fees,

incurred by him or her in connection with the action, suit, or proceeding and any action, suit, or proceeding brought to enforce this mandatory indemnification. Unless ordered by a court, any indemnification permitted under this Article shall be made by the Company only as the Company authorizes in the specific case after (1) determining that the indemnification is proper under the circumstances because the person to be indemnified has met the applicable standard of conduct, and (2) evaluating the reasonableness of the expenses and of the amounts paid in settlement. This determination and evaluation shall be made by a majority vote of the Members who are not parties or threatened to be made parties to the action, suit, or proceeding. However, no indemnification shall be provided to any Member, employee, or agent of the Company for or in connection with (1) the receipt of a financial benefit to which the person is not entitled; (2) voting for or assenting to a distribution to Members in violation of this Operating Agreement or the Act; or (3) a knowing violation of the law.

## ARTICLE VIII

### DISSOLUTION AND WINDING UP

8.1 **Continuation of Company after Disassociation**. Notwithstanding the death, withdrawal, expulsion, bankruptcy, or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member in the Company, the Company's business and affairs shall continue and shall not be dissolved or terminated. If a Member who is an individual dies, or a court of competent jurisdiction judges a Member to be incompetent to manage his or her person or property, that Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling the Member's estate or administering his or her property, including giving the consent required by this Operating Agreement or the Act for an heir, trustee, or successor to be admitted as a substitute Member. On a Member's withdrawal, expulsion, bankruptcy, or dissolution, the Company shall purchase, and the holder shall sell, the disassociating Member's membership interest in the Company at its book value, determined in accordance with generally accepted accounting principles consistently applied. The sale and purchase shall be completed within ninety (90) days of any such event.

8.2 **Dissolution**. The Company shall dissolve and its affairs shall be wound up on the first to occur of the following events only: (1) at any time specified in the Articles; (2) on the occurrence of any event specified in the Articles; or (3) on the unanimous consent of all the Members.

8.3 **Winding Up**. On dissolution, the Company shall cease carrying on its business and affairs and shall begin to wind them up. The Company shall complete the winding up as soon as practicable. On the winding up of the Company, its assets shall be distributed first to creditors, to the extent permitted by law, in satisfaction of Company debts, liabilities, and obligations, and then to Members and former Members, if any, holding obligations of the Company. Distributions to Members and former Members shall be made first to satisfy liabilities for distributions and then in accordance with the

Members' Sharing Ratios. The proceeds shall be paid to the Members within ninety (90) days after the date of the winding up.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

9.1 **Terms**. Nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the identity of the person or persons, firm, or corporation may in the context require.

9.2 **Article Headings**. The article headings contained in this Operating Agreement have been inserted only as a matter of convenience and for reference, and in no way shall be construed to define, limit, or describe the scope or intent of any provision of this Operating Agreement.

9.3 **Counterparts, Facsimile, and E-Mail**. This Operating Agreement may be executed in several counterparts, each of which will be deemed an original, but all of which will constitute one and the same. Executed documents may be transmitted by facsimile or e-mail.

9.4 **Entire Agreement**. This Operating Agreement constitutes the entire agreement among the parties and contains all of the agreements between the parties with respect to the subject matter. This Operating Agreement supersedes any and all other agreements, either oral or written, between the parties with respect to the subject matter.

9.5 **Severability**. The invalidity or unenforceability of any particular provision of this Operating Agreement shall not affect the other provisions, and this Operating Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

9.6 **Amendment**. This Operating Agreement may be amended or revoked at any time by a written agreement executed by all of the parties to this Operating Agreement. No change or modification to this Operating Agreement shall be valid unless made in writing and signed by all the parties to this Operating Agreement.

9.7 **Notices**. Any notice permitted or required under this Operating Agreement shall be conveyed to the party at the address reflected in this Operating Agreement and shall be deemed to have been given when deposited in the United States mail, postage paid, or when delivered in person, by courier, or by facsimile transmission.

9.8 **Binding Effect**. Subject to the provisions of this Operating Agreement relating to transferability, this Operating Agreement shall be binding on and shall inure to the benefit of the parties and their respective distributees, heirs, successors, and assigns.

9.9 **Governing Law**. This Operating Agreement has been executed and delivered in the State of Michigan and shall be governed by, construed, and enforced in accordance with the laws of the State of Michigan.

9.10 **Waiver of Conflicts**. The members acknowledge that the law firm of Dean & Fulkerson has acted as legal counsel to affiliated or contracting entities, and individuals that are engaged with this entity. Among those other clients are Bonnie J. LePage and Restaurant Management, Inc. The members acknowledge the receipt of this information and all waive the conflict.

The parties have executed this First Amended and Restated Operating Agreement effective on the date listed on the first page of this Operating Agreement.

\* \* \*

[Remainder of page is intentionally left blank]

S:\DAF\ET10-Eton Street Brewery, LLC\Corporate\1st Amend to OA 3-4-13-BLK.docx

| Company | Members |
|---|---|

**Company**

Eton Street Brewery, LLC

By: _Bonnie Le Page_
Bonnie J. LePage
Its: Manager and President

**Members**

_Bonnie J Le Page_
Bonnie J. LePage as Trustee of the
Bonnie J. LePage Trust UAD
3/17/97, as amended

and

By: _Mary E. Nicholson_
Mary E. Nicholson
Its: Manager and Vice-President

_Mary E. Nicholson_
Mary E. Nicholson, as Trustee
of the Mary E. Nicholson
Trust UAD 1/14/1988, as amended

DAP\ET10\Corporate\1ˢᵗ Amend to OA 12-6-12-signature pg

# EXHIBIT A

| Name and Address of Members | Initial Capital Contribution | Membership Percentage/ Sharing Ratio |
|---|---|---|
| Bonnie J. LePage Trust<br>UAD 3/17/97, as amended<br>3950 Maple Hill West<br>W. Bloomfield, MI 48323 | $ -0- | 50% |
| Mary E. Nicholson, Trustee<br>UAD 1/14/1988, as amended<br>c/o Blackwell, Inc.<br>P.O. Box 2597<br>Birmingham, MI 48012 | $ -0- | 50% |
| | $ -0- | 100% |

# Exhibit C

In re:

ENERGY DRILLING SERVICES, LLC,       Case No. 22-31772-jda

                                                  Chapter 11 (Subchapter V)

                                                  Hon. Joel D. Applebaum

                                     Debtor.      /

## OPINION AND ORDER DENYING MOTION TO DISMISS

The matter before the Court is Timothy Connors' and James Govan's ("Movants") Motion to Dismiss Energy Drilling Services, LLC's ("EDS") chapter 11 (subchapter V) bankruptcy case. For the reasons set forth below, the Motion to Dismiss is DENIED.

### I.

### FACTUAL BACKGROUND

EDS is a Michigan limited liability company, organized on December 12, 2020. Its primary business is providing foundation drilling and related support services to major regional utility companies across the nation.

On February 16, 2022, Kaitlyn Adler, James F. Govan, and Timothy Connors entered into the Operating Agreement of Energy Drilling Services, LLC, a Michigan Limited Liability Company (the "Operating Agreement") (Docket No. 39, Exhibit A, Operating Agreement). Pursuant to the Operating Agreement, the members of

EDS held the following titles and membership interests in EDS: Kaitlyn Adler, Managing Member ("Ms. Adler"), 51.0%; James F. Govan, Member ("Mr. Govan"), 24.5%; and Timothy Connors, Member ("Mr. Connors"), 24.5%.

On November 11, 2022, Mr. Govan and Mr. Connors entered into a "Unanimous Written Consent of the Eligible Members of Energy Drilling Services, LLC". Mr. Govan and Mr. Connors agreed to expel Ms. Adler as a member of EDS on the grounds that it had been "lawfully, factually, and validly shown" that Ms. Adler had committed theft and/or gross negligence against EDS under §15.04 of the Operating Agreement. The "Unanimous Written Consent" was obtained at a special telephonic meeting and states that Movants were the only members "present . . . [and] eligible to vote", citing § 6.04[1] of the Operating Agreement and/or MCL 450.4409(c).[2] The "Unanimous Written Consent" states that written notice was waived under § 8.05. (Docket No. 39, Exhibit K).

Also on November 11, 2022, Mr. Govan and Mr. Connors sent out a "Notice of Special Meeting of the Members" of EDS to be held on November 21, 2022 to

---

[1] Section 6.04, entitled **Contracts or Transactions with Interested Directors or Officers**, concerns the ratification of contracts in which a Member or officer has an interest. Under 6.04, the disinterested parties could move for EDS to reject or withdraw from such a contract. Section 6.04 does not discuss the termination of a membership interest. The full text is provided in the following section of this Opinion.

[2] MCL 450.4409(c) concerns transactions with interested parties. The full text is provided in the following section of this Opinion.

discuss and *ratify* the expulsion of Ms. Adler as a member of EDS pursuant to §15.01 of the Operating Agreement on the grounds that:

> Ms. Adler, in violation of her fiduciary duty to EDS and in violation of her statutory duty to EDS under MCL 450.4404(1), has engaged in theft from and gross negligence against EDS where such wrongful conduct that has adversely and materially affected the business and/or operation of EDS.

(Docket No. 39, Exhibit L, attachment A).

On November 21, 2022, the special meeting was held. Ms. Adler and her attorney were present along with Mr. Govan and his attorney, Mr. Connors and his attorney, and EDS' attorney. Mr. Govan and Mr. Connors unanimously voted to ratify the Consent Resolution of Expulsion. (Docket No. 39, Exhibit L).

On November 29, 2022, Ms. Adler caused EDS to file for chapter 11, subchapter V, bankruptcy.

On December 9, 2022, Mr. Govan and Mr. Connors filed their Motion to Dismiss Debtor's bankruptcy on the grounds that: (1) Ms. Adler did not have the authority to place EDS into bankruptcy on November 29, 2022 because she had been expelled as a Member and, therefore, removed as Managing Member of EDS, on November 21, 2022; and (2) in the event this Court finds that Ms. Adler's expulsion was invalid, Ms. Adler did not have the authority to place EDS into bankruptcy because the decision to file for bankruptcy is a "Fundamental Business Transaction" that requires the approval of a "Super-Majority," defined as "one or more Members

having among them more than sixty-six and sixty-seven hundredths percent (66.67%) of the Percentage Interests of all Members." (Docket No. 39, Exhibit A).

On December 13, 2022, Debtor filed a response stating that Ms. Adler had the authority to place EDS in bankruptcy because: (1) she had neither been expelled as a Member nor removed as a Managing Member; and (2) placing EDS in bankruptcy is a not a Fundamental Business Transaction requiring agreement of a super-majority of Members.

On December 14, 2022, the Court held a hearing on this matter and requested additional briefing on the issues presented. On December 21, 2022, both Movants and Debtor filed Supplemental Briefs. On December 23, 2022, both Movants and Debtor filed Reply Briefs.[3]

II.

RELEVANT PORTIONS OF THE OPERATING AGREEMENT

---

[3] The Bank of Ann Arbor, Debtor's primary secured creditor, filed a Response to the Motion to Dismiss requesting dismissal under 11 U.S.C. § 1112(b)(1), arguing that EDS is not currently operating and, therefore, Bank of Ann Arbor does not see a path toward reorganization. The Court shares Bank of Ann Arbor's concerns as expressed in its Response (Dkt. 60). According to statements made by the parties and the Subchapter V Trustee at the Court's initial scheduling conference, however, resumption of operations may be imminent. Moreover, the Court cannot determine at this juncture whether dismissal or conversion would be in the best interests of creditors and the estate, among other possibilities. Bank of Ann Arbor's request to dismiss for "cause" under § 1112(b)(1) is, therefore, premature and is denied at this time.

The determination whether Ms. Adler possessed the authority as Managing Member to place EDS in chapter 11 (subchapter V) bankruptcy and whether Mr. Govan and Mr. Connors properly expelled Ms. Adler as a member is based on the Court's consideration of the language of the Operating Agreement. The most pertinent sections of the Operating Agreement are set forth below.

**A. The Portions of the Operating Agreement Addressing the Scope of the Managing Member's Powers for the Purpose of Determining Whether the Managing Member had the Authority to Place EDS Into Bankruptcy.**

Ms. Adler was appointed EDS's Managing Member with the express written consent of Mr. Govan and Mr. Connors. Operating Agreement, § 6.01(a). Section 6.01(a) vests the Managing Member with broad power "to manage control, administer, and operate the business . . . and to make decisions affecting the business and affairs of the Company." Specifically, § 6.01(a) states:

> (a) Except as expressly provided in Section 6.02 and otherwise herein, management of the Company shall be vested in the Managing Member. The Managing Member may not be removed or replaced by the Members but only upon the resignation of such Managing Member. *Except for matters to be approved by or consented to, by the Members under this Agreement, the Managing Member shall have full, exclusive, and complete discretion, power and authority, subject in all cases to the terms of this Agreement and the requirements of applicable law, to manage, control, administer, and operate the business and affairs of the Company for the purposes herein stated, and to make decisions affecting the business and affairs of the Company.* All Members reserve fully all rights granted to the Members under this Agreement and to the extent of such rights, the power and authority of each Member shall be superior to the authority and power of the

Managing Member. Kaitlyn Adler shall serve as the Managing Member. (emphasis added)

Section 6.01(b) more specifically sets forth the Managing Member's powers:

(b) The Managing Member's control over the Company includes, but is not limited to the following: (i) entering into, making, and performing contracts, agreements, and other undertakings binding the Company that may be necessary, appropriate, or advisable in furtherance of the purposes of the Company and making all decisions and waivers thereunder; (ii) opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money, and designating individuals with authority to sign or give instructions to those accounts and arrangements; (iii) maintaining the assets of the Company in good order; (iv) collecting sums due the Company; (v) to the extent that the funds of the Company are available therefor, paying debts and obligations of the company; (vi) acquiring, utilizing for Company purposes, and disposing of any assets of the Company in the ordinary course of business, not otherwise in violation of this Agreement; (vii) borrowing money or otherwise committing the credit of the Company for Company activities and voluntary prepayments or extensions of debt, (vii) selecting, removing, and changing the authority and responsibility of lawyers, accountants, and other advisers and consultants; (ix) obtaining insurance for the Company; (x) determining distributions of Company cash and other property as provided in Section 5.02; (xii) establishing a seal for the Company; and (xii) [sic] designating one or more committees, each of which shall be comprised of one or more Members, to exercise any authority or the Members in the management, business and affairs of the Company.

Section 6.01(c) (the second of two subparagraphs labeled "c") bestows nearly

all authority of the Members on the Managing Member, stating:

(c) [sic] Except for rights vested in the Members pursuant to this Agreement and applicable law, no Member shall take, or commit the

6

Company to take, any action, either in its own name in respect of the Company or in the name of the Company, unless the Managing Member has approved the same, under the authority granted herein.

Section 6.02 of the Operating Agreement delineates certain restrictions on the Managing Member. Specifically, a Managing Member may not enter into a Fundamental Business Transaction without approval by a super-majority of the Members. Section 6.02 states:

6.02 **Restrictions**. Notwithstanding the provisions of Section 6.01, the Members may not cause the Company to do any of the following without complying with the applicable requirements set forth below:

(a) enter into a Fundamental Business Transaction, without the approval by a Super-Majority of the Members (unless such provision is rendered inapplicable by another provision of applicable law).

The term "Fundamental Business Transaction," in turn, is defined in § 1.01 of the Operating Agreement as follows:

"**Fundamental Business Transaction**" means those major transactions of the Company, including (a) merger, (b) an interest exchange, (c) a conversion, (d) sale of all or substantially all of an entity's assets (with or without good will), other than in the ordinary course of the Company's business, or (e) any other strategic acquisition of a target company, whether by acquisition of assets or equity.

**B.     The Portions of the Operating Agreement Addressing the Ability of Members to Expel a Member from the Company.**

Section 15.04 of the Operating Agreement provides that Members can be expelled from the Company. Paragraph 15.04 states:

7

15.04 **Expulsion**. A Member may be expelled from the Company by unanimous vote of all other Members (not including the Member to be expelled) *if it is lawfully, factually and validly shown* that the Member (a) has willfully violated any provisions of this Agreement; (b) committed fraud, theft, or gross negligence against the Company or one or more Members of the Company; or (c) engaged in wrongful conduct that adversely and materially affects the business or operation of the Company. Such a Member shall be considered a Defaulting Member, and the Company of other Members may also exercise any one or more of the remedies provided for in Section 15.01.[4] The Company may offset any damages to the Company or its Members occasioned by the misconduct of the expelled Member against any amounts distributed or otherwise payable by the Company to the expelled Member. (emphasis added)

Section VIII "Meeting of Members" addresses the procedural requirements for holding a meeting of Members. Section 8.01(f) allows for special meetings of the Members.[5] Section 8.01(g) allows for special meetings so long as they are set

---

[4] The remedy applicable to this case is set forth in 15.01(g), "Forfeiture of the Defaulting Member's Membership Interest."

[5] Section 8.01(f) states:

Special meetings of the Members for any proper purpose or purposes may be called at any time by the holders of at least ten percent (10%) of the Percentage Interests of all Members. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting, except that the date may not be earlier than the 60th day before the date the special meeting of Members is originally to be called. *Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members*. (emphasis added).

8

not less than ten days nor more than 60 days before the date of the meeting and the

notice sets forth the purpose or purposes of the meeting.

Section 8.05 addresses "Action by Unanimous Written Consent Without

Meeting." Section 8.05 states, in part:

> (a)    Any action required or permitted to be taken at any annual
> or special meeting of Members may be taken without a meeting,
> without prior notice, and without a vote, by unanimous written consent
> of the Members or committee members, as the case may be, setting
> forth the action so taken . . . .

Section 6.04 addresses "Contracts or Transactions with Interested Directors

or Officers." Section 6.04 allows for such contracts so long as (i) the relationship is

disclosed and approved of by the Members, (ii) the contract is fair to the Company

when it was entered, or (iii) is ratified by the Members.    Section 6.04 states:

> This provision applies only to a contract or transaction between the
> Company and one or more of its Members or officers, or between the
> Company and an entity or other organization in which one or more of
> the Company's Members or officers is a managerial official or has a
> financial interest.  An otherwise valid contract or transaction is valid
> notwithstanding that a Member or officer of the company is present at
> or participates in the meeting of the Members or officers, or of a
> committee of the Members or officers that authorizes the contract or
> transaction, or votes or signs, in the person's capacity as a Member or
> officer, a written consent of Members or officers to authorize the
> contract or transaction, if: (1) the material facts as to the relationship or
> interest and as to the contract or transaction are disclosed to or known
> by (a) the Members or officers or a committee of the Members or
> officers and the Members or officers or committee in good faith
> authorize the contract or transaction by the affirmative vote of the
> majority of the disinterested Members or officers or committee
> members, regardless of whether the disinterested Members or officers
> or committee members constitute a quorum; or (b) the Members of the

Company, and the Members in good faith approve the contract or transaction by vote of the Members; or (2) the contract or transaction is fair to the Company when the contract or transaction is authorized, approved, or ratified by the Members or officers, a committee of the Members or officers, or the Members of the Company.

III.

<u>ANALYSIS</u>

About the only thing Movants and Debtor agree upon is that the Operating Agreement is a contract, the interpretation and construction of which presents a question of law for the Court to decide. *Titan Ins. Co. v. Hyten*, 817 N.W.2d 562 (Mich. 2012). "The fundamental goal of contract interpretation is to determine and enforce the parties' intent by reading the agreement as a whole and applying the plain language used by the parties to reach their agreement." *Dobbelaere v. Auto-Owners Ins. Co.*, 740 N.W.2d 503, 529 (Mich. Ct. App. 2007). The Court must also endeavor to give effect to every word, phrase, and clause in a contract, and avoid a contract interpretation that would render any part of the contract surplusage or nugatory. *Solo v. United Parcel Service Co*., 819 F.3d 788, 794 (6th Cir. 2016) (applying Michigan law).

**A. Filing a Petition Under Chapter 11 of the Bankruptcy Code is not a "Fundamental Business Transaction" as Defined in the Operating Agreement.**

This Court will first address whether placing EDS in chapter 11 (subchapter V) bankruptcy is a Fundamental Business Transaction. As previously noted, a super-

majority is required to enter into a Fundamental Business Transaction. Fundamental Business Transaction "means those major *transactions* of the Company, including (a) merger, (b) an interest exchange, (c) a conversion, (d) sale of all or substantially all of an entity's assets (with or without good will), other than in the ordinary course of the Company's business, or (e) any other strategic acquisition of a target company, whether by acquisition of assets or equity." (emphasis added)

The plain and ordinary meaning of the word "transaction" is "something transacted -- especially an exchange or transfer of goods, services, or funds." *Merriam-Webster.com* The application of this definition is supported by the very examples used in the Operating Agreement's definition of Fundamental Business Transaction, each of which involve an *exchange* of stock or interests (merger/interest exchange), a *sale* other than in ordinary course of business (purchase transaction – an exchange of goods or services for money), or a strategic *acquisition* of target company by acquisition of assets or equity (either purchase transaction or equity exchange). The filing of a petition under chapter 11 of the Bankruptcy Code is not included in the definition of Fundamental Business Transaction for the simple reason that the filing of a petition under chapter 11 of the Bankruptcy Code is not a *transaction* as that term is defined or used in the Operating Agreement.

With the sole exception of the restrictions in § 6.02 of the Operating Agreement, the only pertinent one being the restriction on entering into Fundamental

Business Transactions, the Managing Member is exclusively vested with broad management authority over Debtor's affairs pursuant to § 6.01 of the Operating Agreement. Because the filing of a chapter 11 bankruptcy petition is not a Fundamental Business Transaction, it was within Ms. Adler's sole authority as Managing Member to place Debtor into bankruptcy.

Movants raise two closely related arguments why filing bankruptcy must be considered a Fundamental Business Transaction requiring the prior approval of a super-majority of the Members. First, Movants contend that the definition of Fundamental Business Transaction uses the word "including," a word of enlargement that "conveys the conclusion that there are other items includable, though not specifically enumerated . . . ." (Dkt. No. 99, p.8, citing *Michigan Bell Tel. Co. v. Department of Treasury*, 518 N.W.2d 808 (Mich. 1994). According to Movants, this expansive term, coupled with the canon *noscitur a sociis* ("it is known by its associates"), requires the conclusion that putting the Debtor into bankruptcy is so fundamental and has such far reaching consequences that it must be considered a Fundamental Business Transaction. In connection with this argument, Movants distinguish what appears to be a majority of non-binding opinions holding the other way. Second, in their companion argument, Movants assert that the authority granted to the Managing Member under § 6.01 of the Operating Agreement is not as expansive as Ms. Adler claims, and is more properly understood to vest sole

authority for *ordinary* operations of the Debtor. Filing bankruptcy clearly falls outside the ordinary operations of the Debtor and, therefore, must also fall outside of the scope of Ms. Adler's unilateral authority as Managing Member.

Turning to Movants' first argument, the Court agrees that the term "including" is a word of enlargement that "conveys the conclusion that there are other items includable, though not specifically enumerated . . . ." *Id.* The Court also agrees that the canon *noscitur a sociis* ("when several words have something in common, they should be assigned a permissible meaning that makes them similar,")[6] is applicable here. The Court disagrees, however, with Movants' conclusion that the word "including" and application of the canon *noscitur a sociis* require a finding that filing a bankruptcy petition is a Fundamental Business Transaction.

The Court's overarching obligation here is to determine and enforce the parties' intent by reading the agreement as a whole, applying the plain language used by the parties to reach their agreement, and endeavoring to give effect to every word, phrase, and clause in a contract. As noted above, the examples used in the Operating Agreement's definition of Fundamental Business Transaction all involve an *exchange*, a *sale* (other than in ordinary course of business), or strategic *acquisition* of target company. These examples fall squarely within the plain and ordinary

---

[6] *Atlantic Casualty Inc. Co. v. Gustafson*, 891 N.W.2d 499, 503 (Mich. Ct. App. 2016).

meaning of the word "transaction" as "something transacted -- especially an exchange or transfer of goods, services, or funds." Even accepting that the term "including" is a word of enlargement that means there are other items includable, though not specifically enumerated, the Court cannot insert items that fail to comport with the definition of "transaction." This conclusion is borne out by a proper application of the canon *noscitur a sociis*. Here, the Operating Agreement contains several words that fall squarely within the definition of "transaction." The use of the word "including" means that there may be additional examples of an exchange or transfer of goods, services, or funds. But the Court cannot apply *noscitur a sociis* to add dissimilar, non-transactional items to the definition of Fundamental Business Transaction that do not fall within the definition of "transaction" as that word is ordinarily understood. To do as Movants' suggest would be to disregard the canon *noscitur a sociis* upon which Movants' rely.

This conclusion is also supported by cases holding that an operating agreement may grant a managing member authority to file a bankruptcy petition, as exemplified by the case *In re East End Development, LLC*, 491 B.R. 633 (Bankr. E.D.N.Y. 2013). In *East End Development*, the court recognized that the "entity vested with 'the power of management' has the requisite authority to file a petition in bankruptcy." *Id*. at 638, quoting *Price v. Gurney*, 324 U.S. 100, 104 (1945). The *East End Development* court properly examined the operating agreement to

14

determine the manager's authority to file a bankruptcy petition, applying traditional rules of contract interpretation as this Court has done.  As in this case, the operating agreement did not explicitly grant the managing member authority to file a bankruptcy petition, nor did the operating agreement prohibit it.  Nevertheless, the court noted that the operating agreement granted the managing member "broad powers" to act on behalf of the debtor, whereas the actions for which member consent was required were narrow and specific. As a result, the court concluded that the operating agreement was sufficiently clear and unambiguous and that the managing member was authorized to file the bankruptcy petition.  *See also, In re Lexington Hospitality Group, LLC*, 577 B.R. 676, 686-688 (Bankr. W.D. Ky. 2017) (grant of broad authority to managing member included authority to file bankruptcy petition).

As in *East End Development* and *Lexington Hospital Group*, the Operating Agreement here does not explicitly grant Ms. Adler, as managing member, authority to file a bankruptcy petition.  What the Operating Agreement does, however, is grant the managing member the authority to take *all* actions on behalf of the company unless otherwise restricted.  Operating Agreement, § 6.02.  As noted above, the only applicable restriction on the authority of the managing member is entering into a Fundamental Business Transaction which, for the reasons discussed above, is not applicable to the filing of a bankruptcy petition.

In contrast to the above cases, Movants direct the Court to *In re Avalon Hotel Partners, LLC*, 302 B.R. 377 (Bankr. D. Ore. 2003). In that case, the applicable operating agreement provided that "Major Decisions" required the approval of members holding in excess of 75% of the Ownership Interests. *Id*. at 380. The court determined that filing a bankruptcy petition is a decision outside of the ordinary course of business and, therefore, constituted a "Major Decision" requiring member approval in excess of 75%. The court also held that Oregon law requires the consent of a majority of members to convert an LLC into any other type of entity, and that a bankruptcy filing "converted" the company into a debtor-in-possession in violation of this provision of Oregon law. *Id*. at 380-381.

The Court does not find the *Avalon Hotel Partners* case persuasive for two primary reasons. First, the Court must look to the language used in the Operating Agreement, as the *Avalon Hotel Partners* court recognized. The term "*Decision*" is very different from the more narrowly defined term "*Transaction*" used in the instant Operating Agreement. Second, a company's authority to file bankruptcy is controlled by state law. *In re Curare Laboratory, LLC*, 642 B.R. 787, 801 (Bankr. W.D. Ky. 2022). Unlike the Oregon statute, this Court is unaware of (and the parties have not directed the Court to) any provision of Michigan law that would prohibit a manager of a manager-operated limited liability company from filing a bankruptcy petition if authorized to do so under the applicable operating agreement.

16

As to Movants' assertion that the authority granted to the Managing Member under § 6.01 of the Operating Agreement is not as expansive as Ms. Adler claims, and is more properly understood to vest sole authority for *ordinary* operations of the Debtor, the Court rejects this argument. Nothing in the Operating Agreement purports to limit Ms. Adler's authority solely to "ordinary" operations, although the parties could have drafted the Operating Agreement that way. Rather, the Operating Agreement was drafted to vest the Managing Member with authority over the business of the company except for Fundamental Business Transactions. Therefore, Ms. Adler possessed the requisite authority to file the bankruptcy petition on behalf of the Debtor.

### B. The Attempt to Expel Ms. Adler was Legally and Procedurally Invalid.

Movants attempt to expel Ms. Adler as a Member was legally invalid because Movants failed to comply with § 15.04 of the Operating Agreement. That section provides in pertinent part:

> 15.04 **Expulsion**. A Member may be expelled from the Company by unanimous vote of all other Members (not including the Member to be expelled) *if it is lawfully, factually and validly shown* that the Member (a) has willfully violated any provisions of this Agreement; (b) committed fraud, theft, or gross negligence against the Company or one or more Members of the Company; or (c) engaged in wrongful conduct that adversely and materially affects the business or operation of the Company.

(Emphasis added)

As Movants emphasized in their Reply Brief (Dkt. No. 99), the Court is obligated to determine and enforce the parties' intent by reading the agreement as a whole, apply the plain language used by the parties to reach their agreement, and endeavor to give effect to every word, phrase, and clause in the Operating Agreement.

Here, the Operating Agreement clearly envisions that a Member may not be expelled from membership unless it is *lawfully, factually and validly shown* that the Member willfully violated the Operating Agreement; committed fraud, theft, or gross negligence against the Company or one or more Members of the Company; or engaged in wrongful conduct that adversely and materially affected the business or operation of the Company. The Operating Agreement does not set forth any procedures for making this determination.

While the Operating Agreement does not set forth procedures for showing *lawfully, factually and validly* that a Member has committed what are serious acts of misconduct against the Company or other Members, the words "*lawfully, factually and validly shown*" must be given meaning. At a minimum, *before* expulsion, there must be a hearing with proper procedural protections where the alleged misconduct is lawfully, factually and validly established.

In this case, Movants arrogated to themselves the right to act as prosecutor, judge, and jury, as is obvious from their November 11, 2022 "Notice of Special

Meeting of the Members" to be held on November 21, 2022 "to discuss and *ratify the expulsion of Kaitlyn Adler as a member of EDS . . . ."* While one can argue over the standards of procedural due process that should have been afforded to Ms. Adler, notifying her that Movants had already decided to expel her falls woefully short. By decreeing a right of expulsion without hearing and with themselves as the sole decision makers, they effectively assert the right to expel Ms. Adler for any reason or for no reason whatsoever. This flies in the face of the language in the Operating Agreement and renders the phrase "*lawfully, factually and validly shown*" meaningless.

Even if Movants had provided a modicum of due process and had "*lawfully, factually and validly shown*" that Ms. Adler committed misconduct justifying expulsion under § 15.04 of the Operating Agreement, Movants failed to adhere to the proper procedural requirements for expelling Ms. Adler from EDS.

In the document entitled "Unanimous Written Consent" dated November 11, 2022, Movants indicate that they held a "special telephonic meeting", with written notice being waived under § 8.05, for the purpose of considering the expulsion of Ms. Adler as a Member of EDS and that they, alone, were the only members present at that meeting. (Docket No. 39, Exhibit K, line 1). The document also states that Movants did not notify Ms. Adler of this meeting because they believed that they

were the only Members eligible to vote, citing on § 6.04 of the Operating Agreement and/or MCL 450.4409(c).

This Court finds that the meeting held on November 11, 2022 was not governed by § 8.05 because § 8.05 is titled "Action by Unanimous Written Consent *Without Meeting*" (emphasis added), and the document itself states that a "special telephonic meeting" was held.  In addition, the findings set forth in the November 11, 2022 document were not by unanimous consent because Ms. Adler did not consent and had not yet been determined to be ineligible to vote.

Instead, the requirements for a meeting set forth in § 8.01(g)(the provisions for special meetings) apply in this instance. Section 8.01(g) requires written or printed notice of meetings and,

> in the case of a special meeting, the purpose or purposes for which the meeting is called shall be given not less than ten (10) days nor more than sixty (60) days before the date of the meeting, either personally or by mail . . . to each Member entitled to vote at such meeting.

In this case, Ms. Adler was not notified of the telephonic special meeting and, therefore, the November 11, 2022 meeting was not properly held and any decisions made at that meeting are void. This Court rejects any argument that, based on § 6.04 and/or MCL 450.4409(c), Ms. Adler need not be notified of the telephonic special meeting because neither § 6.04 nor MCL 450.4409(c) address notice of meetings or in any way imply that notice is waived, and Ms. Adler had not yet been shown to be

20

ineligible to vote.  For these reasons, the November 11, 2022 meeting was not properly held and any decisions made at that meeting are void.

## ORDER DENYING MOTION TO DISMISS

Accordingly, for the reasons set forth in this Opinion,

IT IS HEREBY ORDERED that Movants' Motion to Dismiss is DENIED.

**Signed on January 13, 2023**



/s/ Joel D. Applebaum
**Joel D. Applebaum**
**United States Bankruptcy Judge**

# Exhibit D

Fill in this information to identify your case:

United States Bankruptcy Court for the:

EASTERN DISTRICT OF MICHIGAN

Case number *(if known)* _____     Chapter     **11**

☐ Check if this an
amended filing

## Official Form 201
# Voluntary Petition for Non-Individuals Filing for Bankruptcy     06/24

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | | | |
|---|---|---|---|
| 1. | Debtor's name | **Eton Street Brewery, LLC** | |
| 2. | All other names debtor used in the last 8 years<br>Include any assumed names, trade names and *doing business as* names | **DBA  Griffin Claw Brewing Company**<br>**DBA  Griffin Claw Clubhouse** | |
| 3. | Debtor's federal Employer Identification Number (EIN) | **45-3325219** | |

4. **Debtor's address**

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| **575 S Eton Street**<br>**Birmingham, MI 48009**<br>Number, Street, City, State & ZIP Code | **PO Box 2597**<br>**Birmingham, MI 48012**<br>P.O. Box, Number, Street, City, State & ZIP Code |
| **Oakland**<br>County | **Location of principal assets, if different from principal place of business** |
| | Number, Street, City, State & ZIP Code |

| | | |
|---|---|---|
| 5. | Debtor's website (URL) | **griffinclawbrewingcompany.com** |

6. **Type of debtor**

■ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other. Specify: _____

7.  **Describe debtor's business**    A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

■ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes.

__5812__

8.  **Under which chapter of the Bankruptcy Code is the debtor filing?**    *Check one:*

☐ Chapter 7

☐ Chapter 9

■ Chapter 11. *Check **all** that apply:*

■ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725 (amount subject to adjustment on 4/01/25 and every 3 years after that).

■ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

■ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and it chooses to proceed under Subchapter V of Chapter 11.

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

9.  **Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**
If more than 2 cases, attach a separate list.

■ No.

☐ Yes.

| | District | When | Case number |
|---|---|---|---|
| | _____ | _____ | _____ |
| | _____ | _____ | _____ |

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

■ No
☐ Yes.

| | |
|---|---|
| List all cases. If more than 1, attach a separate list | Debtor _____      Relationship _____ |
| | District _____ When _____    Case number, if known _____ |

**11. Why is the case filed in *this district*?**

*Check all that apply:*

■ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

■ No
☐ Yes.   Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

     What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?** _____

     Number, Street, City, State & ZIP Code

**Is the property insured?**

☐ No

☐ Yes.   Insurance agency _____

         Contact name _____

         Phone _____

---

**■ Statistical and administrative information**

**13. Debtor's estimation of available funds**

*Check one:*

■ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available to unsecured creditors.

**14. Estimated number of creditors**

| | | |
|---|---|---|
| ■ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than100,000 |
| ☐ 200-999 | | |

**15. Estimated Assets**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ■ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

**16. Estimated liabilities**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ■ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |

☐ $50,001 - $100,000          ☐ $10,000,001 - $50  million       ☐ $1,000,000,001 - $10 billion
☐ $100,001 - $500,000         ☐ $50,000,001 - $100 million       ☐ $10,000,000,001 - $50 billion
☐ $500,001 - $1 million       ☐ $100,000,001 - $500 million      ☐ More than $50 billion

| | Request for Relief, Declaration, and Signatures |
|---|---|

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **July 26, 2024**
MM / DD / YYYY

**X** /s/ Bonnie LePage          Bonnie LePage
Signature of authorized representative of debtor      Printed name

Title   **Manager and President**

**18. Signature of attorney**

**X** /s/ Brendan G. Best         Date   July 26, 2024
Signature of attorney for debtor                     MM / DD / YYYY

**Brendan G. Best**
Printed name

**Varnum LLP**
Firm name

**480 Pierce Street**
**Birmingham, MI 48009**
Number, Street, City, State & ZIP Code

Contact phone   **248-567-7800**      Email address   **bgbest@varnumlaw.com**

**P66370 MI**
Bar number and State

Fill in this information to identify the case:

Debtor name **Eton Street Brewery, LLC**

United States Bankruptcy Court for the: EASTERN DISTRICT OF MICHIGAN

Case number (if known)

☐ Check if this is an
amended filing

Official Form 202
# Declaration Under Penalty of Perjury for Non-Individual Debtors 12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)
☐ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
☐ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
☐ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
☐ *Schedule H: Codebtors* (Official Form 206H)
☐ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)
☐ Amended *Schedule*
☑ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
☐ Other document that requires a declaration

I declare under penalty of perjury that the foregoing is true and correct.

Executed on **July 26, 2024**      X /s/ Bonnie LePage
_____
Signature of individual signing on behalf of debtor

**Bonnie LePage**
Printed name

**Manager and President**
Position or relationship to debtor

**United States Bankruptcy Court**
**Eastern District of Michigan**

In re   **Eton Street Brewery, LLC**

                                  Debtor(s)

Case No. _____

Chapter   **11**

# VERIFICATION OF CREDITOR MATRIX

I, the Manager and President of the corporation named as the debtor in this case, hereby verify that the attached list of creditors is true and correct to the best of my knowledge.

Date:   **July 26, 2024**

                                           **/s/ Bonnie LePage**
                                           **Bonnie LePage/Manager and President**
                                           Signer/Title

1339 Combermere, LLC
6632 Telegraph Rd.
#320
Bloomfield Hills, MI 48301


Advantage Paper
PO Box 333
Washington, MI 48094


Alliance Beverage Distributing, Inc.
4490 60th St. SE
Grand Rapids, MI 49512


Alpena Beverage Company
1313 Kline Rd.
Alpena, MI 49707


Amerigas
P.O. Box 371473
Pittsburgh, PA 15250


Apex Law
32900 Five Mile
Livonia, MI 48154


Ardagh Metal Beverage
8770 West Bryn Mawr Ave.
Chicago, IL 60631


Arryved, Inc
3002 Sterling Circle
Suite 100
Boulder, CO 80301


BCBS of Michigan
P.O. Box 33608
Detroit, MI 48232


Boccard Pipe Fabricators Inc.
2500 Galveston Rd.
Houston, TX 77017


Brewers Supply Group
800 West 1st Ave.
Shakopee, MN 55379

City of Birmingham
151 Marlin St.
Birmingham, MI 48009


City of Rochester Hills
1000 Rochester Hills Dr.
Rochester, MI 48309


City of Troy – Water
4693 Rochester Rd.
Troy, MI 48085


Consumers Energy
P.O. Box 74309
Cincinnati, OH 45274


Dakota Bread Company
8451 Boulder Ct.
Suite 250
Walled Lake, MI 48390


Dan Henry Distributing, Inc.
5500 N. Aurelius Rd.
Lansing, MI 48911


Detroit Zoological Society
8450 W. 10 Mile Rd.
Suite 1
Royal Oak, MI 48067


Detroit Zoological Society
8450 W. 10 Mile Rd.
Suite 1
Royal Oak, MI 48067


DTE Energy
P.O. Box 740786
Cincinnati, OH 45274


Eastown Distributors
14400 Oakland Rd.
Highland Park, MI 48203

Ecolab
18591 Millstone Dr.
Macomb, MI 48044


Eganix Pest Elimination
1091 Centre Rd.
Ste. 120
Auburn Hills, MI 48326


Eton Street Brewery Real Estate, LLC
575 South Eton Street
Birmingham, MI 48009


Eton Street Brewery Real Estate, LLC
575 South Eton Street
Birmingham, MI 48009


Fraza
2770 Research Dr.
Rochester, MI 48309


I.H.S. Distributing, Inc.
1800 Douglas Ave.
Kalamazoo, MI 49007


Imperial Beverage Company
3825 Emerald Drive
Kalamazoo, MI 49001


John P. O'Sullivan Distributing, Inc.
4047 Market Pl
Flint, MI 48507


M. Beshara, Inc.
10020 Capital St.
Oak Park, MI 48237


Malteurop
3830 W. Grant S
Milwaukee, WI 53215


Mark A. Papak d/b/a Blackwell, Inc.
P.O. Box 2597
Birmingham, MI 48012

Mary E. Nicholson Trust U/A/D 1/14/1988
c/o Michael A. Gagleard
251 E Merrill St.
Suite 212
Birmingham, MI 48009


McKernan Door
30596 Groesbeck Hwy
Roseville, MI 48066


MLCC
P.O. Box 30005
Lansing, MI 48909


NCR Local – Ohio/Detroit
2401 Sawmill Pkwy.
Huron, OH 44839


Northstar Sourcing, LLC
400 Monroe Street
Suite 420
Detroit, MI 48226


O&W, Inc.
3003 William Ave.
Ypsilanti, MI 48198


Premium Distributors of Michigan


Principal Financial Group
PO Box 77202
Minneapolis, MN 55480-7200


Restaurant Management, II
c/o Taft Law
27777 Franklin Rd.
#2500
Southfield, MI 48034


Runco Waste Industries
P.O. Box 37379
Oak Park, MI 48237

Sovereign Flavors, Inc.
4020 W. Chandler Ave.
Santa Ana, CA 92704


The LePage Family
c/o Richard Kruger
Taft Law
27777 Franklin Rd., Ste. 2500
Southfield, MI 48034


Tricsity Computer Solutions
1092 Brooklawn
Troy, MI 48084


Valley City Linen
13165 Cloverdale St. #1
Oak Park, MI 48237


Vermont Information Processing
402 Watertower Circle
Colchester, VT 05446


Wild Goose Filling
633 CTC Blvd
Suite 100
Louisville, CO 80027


Yakima Chief Hops
306 Division Street
Yakima, WA 98902

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

In re:

ETON STREET BREWERY, LLC,

        Debtor.

Case No. 24-47188
Chapter 11
Hon. Mark A. Randon

---

## COVER SHEET FOR RESOLUTION
## AUTHORIZING BANKRUPTCY FILING

### **VARNUM LLP**
Brendan G. Best (P66370)
William L. Thompson (P80123)
480 Pierce Street, Ste. 300
Birmingham, MI 48009

Proposed Counsel for Debtor-in-Possession

# WRITTEN CONSENT
## OF
## PRESIDENT
## OF
## ETON STREET BREWERY, LLC
### June 25, 2024

The undersigned, being the President of Eton Street Brewery, LLC, a Michigan limited liability company (the "**Company**"), acting pursuant to the First Amended and Restated Operating Agreement of the Company, effective as of December 16, 2011 (the "**Operating Agreement**"), including but not limited to Section 6.2 thereof, does hereby consent to the adoption of the following resolutions as of the date hereof.

**WHEREAS**, the President has determined that it is desirable and in the best interests of the Company and its members, creditors, employees, and other interested parties that the Company commence and conduct a proceeding under the provisions of Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") by the filing of a petition seeking relief thereunder.

## Chapter 11 Proceeding

**NOW, THEREFORE, BE IT RESOLVED**, that the Company be, and hereby is, authorized and empowered to begin and prosecute a proceeding via a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (such voluntary petition, and the voluntary petitions to be filed by the Company's affiliates, collectively, the "**Chapter 11 Proceedings**") in a court of proper jurisdiction (the "**Bankruptcy Court**"); and

**RESOLVED FURTHER**, that the President be and is authorized, in the name and on behalf of the Company, appointed as the Company's authorized representative, and in such capacity, with power of delegation, be, and hereby is, authorized and empowered to execute and file on behalf of the Company, in connection with the Chapter 11 Proceedings and any proceedings ancillary thereto, all petitions, schedules, lists, applications, pleadings and other motions, papers, agreements, consents or documents, and to take any and all action that the President deems necessary or proper to obtain such relief, including, without limitation, any action necessary to maintain the ordinary course operation of the Company's businesses.

## Retention of Professionals

**RESOLVED FURTHER**, that the President be, and hereby is, authorized and directed to employ the law firm of Varnum LLP as general bankruptcy counsel to represent and assist the Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance the Company's rights and obligations, including filing any pleadings; and in connection therewith, the President, with power of delegation, is hereby authorized and directed to execute

appropriate retention agreements, pay appropriate retainers, and to cause to be filed an appropriate application for authority to retain the services of Varnum LLP.

**RESOLVED FURTHER** that the President be, and hereby is, authorized and directed to employ the firm of Morris Anderson & Associates, Ltd. (**"MAA"**) as restructuring advisor to represent and assist the Company in carrying out its duties under the Bankruptcy Code, and to take all actions to advance the Company's rights and obligations, including but not limited to assisting with the preparation of cash collateral budgets, schedules, a statement of financial affairs, monthly operating reports, any other required reporting related to the Bankruptcy Court, and providing testimony in Bankruptcy Court proceedings as necessary; in connection therewith, the President, with power of delegation, is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed appropriate applications for authority to retain the services of MAA. Daniel F. Dooley, a principal of MAA, is also hereby appointed as the sale agent of the Company (the **"Sale Agent"**) to prepare basic marketing materials and host a virtual data room for purposes of soliciting bids for substantially all of the Company's assets (the **"Assets"**), assist counsel for the Company in negotiating any stalking horse bidder asset purchase agreement, including developing appropriate bidding procedures, interfacing with all potential bidders for the Assets, and in the event that multiple qualified bids for the Assets are received, conducting an auction for the sale of the Assets, subject to applicable law and the Operating Agreement. The Sale Agent shall report to the President and shall also communicate equally to all members of the Company (a **"Member"**) and/or any Member's representatives during the bid solicitation process. The Sale Agent shall exclude any Member from such communications regarding all issues related to the sale of the Assets if a Member indicates a desire to submit a bid for the Assets. In the event that all Members of the Company are also bidders, the Sale Agent shall evaluate any and all bids and present his recommendations to all Members as well as the Bankruptcy Court or other court or body in any other proceeding, with notice to all parties in interest, and request court approval on behalf of the Company for such sale as he deems in his professional opinion to be the highest and best offer for the Assets.

**RESOLVED FURTHER** that the President be, and hereby is, authorized and directed to employ any other professionals to assist the Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance the Company's rights and obligations; and in connection therewith, the President, with power of delegation, is hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed appropriate applications for authority to retain the services of any other professionals as necessary.

**RESOLVED FURTHER,** that in addition to the specific authorizations heretofore conferred upon the President, the President (and their designees and delegates) be, and hereby is, authorized and empowered, in the name of and on behalf of the Company, to take or cause to be taken any and all such other and further action, and to execute, acknowledge, deliver and file any and all such agreements, certificates, instruments and other documents and to pay all expenses, including but not limited to filing fees, in each case as in such officer's or officers' judgment, shall be necessary, advisable or desirable in order to fully carry out the intent and accomplish the purposes of the resolutions adopted herein.

**RESOLVED FURTHER**, that all acts, actions and transactions relating to the matters contemplated by the foregoing resolutions done in the name of and on behalf of the Company, which acts would have been approved by the foregoing resolutions except that such acts were taken before the adoption of these resolutions, are hereby in all respects approved and ratified as the true acts and deeds of the Company with the same force and effect as if each such act, transaction, agreement or certificate has been specifically authorized in advance by resolution by the President.

IN WITNESS WHEREOF, the undersigned President has duly executed this Written Consent as of the date first written above.

_Bonnie J. LePage_

Bonnie J. LePage, President