UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION (DETROIT)

In re:                                              Chapter 11

Eton Street Brewery, LLC,                           Case Number 24-47188

    Debtor.                                     Hon. Mark A. Randon

_____/

**OPINION AND ORDER GRANTING THE MARY E. NICHOLSON TRUST U/A/D JANUARY 14, 1994 AND THE MICHAEL NICHOLSON TRUST U/A/D MARCH 17, 1997'S MOTION TO DISMISS**

**I.    INTRODUCTION**

Membership has its privileges.[1]

Through a chapter 11 (subchapter V) bankruptcy filing and contemporaneous § 363 sale motion, Eton Street Brewery, LLC ("Debtor") seeks to achieve a result unattainable under non-bankruptcy law: the sale of its successful business—without the consent of two objecting members—who hold a combined 50 percent equity interest in Debtor, and to whom Debtor allegedly owes over $8 million.

Facing a potential state court judgment on the objecting-members' lawsuit, Debtor's Managing Member and President made the unilateral decision to file bankruptcy and sell the business as a going concern. But was she authorized to do so? The objecting members move to dismiss on several grounds, including that unanimous member consent was required to file bankruptcy. Because: (1) Debtor's operating agreement unambiguously limits its President's power to the "ordinary and usual decisions concerning the business"—and bankruptcy is neither;

---

[1] In the late 1980's, American Express introduced this iconic tagline to reinforce the power, prestige, and benefits of carrying its embossed piece of plastic.

and (2) Debtor's Manager and President's unilateral, prepetition decision to retain a company to market for sale, and prepare an insider's $2.1 million stalking-horse bid, violated the express provisions of the operating agreement, the Court **GRANTS** the motion and **DISMISSES** Debtor's bankruptcy.

## II. BACKGROUND

### A. *Creation of Griffin Claw Brewing Company and Griffin Claw Clubhouse*

Norman LePage ("LePage") and Ray Nicholson ("Nicholson") were business partners for decades. Their relationship was fruitful. Together they operated several restaurants, including Big Rock Chophouse in Birmingham, Michigan ("Big Rock"). Two of the craft beer offerings at Big Rock were awarded medals in the 2010 World Cup of Beer for the best IPA in the world in the American-style IPA category. In the wake of these prestigious awards, Debtor was organized to own and operate a large-scale brewing operation called Griffin Claw Brewing Company in Birmingham. LePage and Nicholson agreed to expand the operation, adding a second taproom and brewery operation in Rochester Hills, Michigan. The Griffin Claw Brewery pubs are popular venues for casual dining and specialty craft beers.

When LePage and Nicholson purchased the Clubhouse BFD restaurant in Rochester Hills in 2019, they renamed it Griffin Claw Clubhouse. The purchase price was funded, in part, through a loan from Mary E. Nicholson, as Trustee of the Mary E. Nicholson Trust UAD 1/14/1988, as amended ("the Mary Trust"). Although the repayment terms were memorialized in an Amended Promissory Note, Debtor says Nicholson verbally agreed that the business debts would be paid through its operations before repayment of any debt owing the Mary Trust. However, this repayment arrangement was never committed to writing, and Nicholson died on

November 30, 2019. Nicholson's death ended the successful business relationship and led to growing contention between the Nicholson and LePage families over repayment of the note.[2]

### B. Debtor's Corporate Structure

Debtor was organized on May 20, 2011, under the Michigan Limited Liability Company Act ("the Act") as a domestic limited liability company.[3] It is a member-managed company. The initial members were Bonnie J. LePage, as Trustee of the Bonnie J. LePage Trust UAD 3/17/97, as amended ("the Bonnie Trust"); and the Mary Trust. Each held a 50 percent membership interest in Debtor.

### C. First Amended and Restated Operating Agreement of Eton Street Brewery, LLC

On December 16, 2011, the members executed a First Amended and Restated Operating Agreement of Eton Street Brewery, LLC ("Operating Agreement"). Section 6.1 of the Operating Agreement governs the management of the business:

> The Company shall be managed by two persons ("Managers"). The Members shall determine each Manager's terms, duties, compensation and benefits, of[sic] any. The Managers shall serve at the will and pleasure of the Members. The Managers of the Company shall be Bonnie J. LePage, and she shall additionally be given the title of President, and Mary E. Nicholson, and she shall additionally be given the title of Vice-President.

Section 6.1(a). Section 6.2 outlines the general power of its Manager-President:

> Except as may otherwise be provided in this Operating Agreement, the *ordinary and usual decisions* concerning the business and affairs of the Company as customarily performed by an organization's president shall be made by the Company's President. The President has the power, on behalf of the Company, to

---

[2]As co-owner, Scott LePage told the Detroit News, "We're a profitable company. We've always been profitable, it's just that we got put into this position and ownership can't agree." (Dkt. No. 89, Exhibit B, p.2).

[3]The name was changed from Cole Street Brewery, LLC on June 9, 2011.

> do all things necessary or convenient to carry out the Company's business and affairs, including the power to (1) purchase, lease, or otherwise acquire any real or personal property, (2) sell, convey, mortgage, grant a security interest in, pledge, lease, exchange, or otherwise dispose of or encumber any real or personal property; (3) open one or more depository accounts and make deposits into, write checks against, and make withdrawals against such accounts, (4) borrow money and incur liabilities and other obligations; (5) enter into any and all agreements and execute any and all contracts, documents, and instruments; (6) engage employees and agents and define their respective duties and compensation, (7) establish pension plans, trusts, profit-sharing plans, and other benefit and incentive plans for Members, employees, and agents of the Company; (8) obtain insurance covering the business and affairs of the Company and its property, and on the lives and well-being of its Members, employees, and agents; (9) begin, prosecute, or defend any proceeding in the Company's name; and (10) participate with others in partnerships, joint ventures, and other associations and strategic alliances.

(Emphasis added). Section 6.3 limits the general power of Managers:

> *Notwithstanding any other provision of this Operating Agreement, no act shall be taken, sum expended, decision made, obligation incurred, or power exercised by any Manager on behalf of the Company, except by the unanimous consent of all Members, with respect to* (1) any significant and material purchase, receipt, lease exchange, or other acquisition of any real or personal property or business; (2) *the sale of all or substantially all of the assets and property of the Company*; (3) any mortgage, grant of security interest, pledge, or encumbrance on all or substantially all of the assets and property of the Company; (4) any merger; (5) any amendment or restatement of the Articles [of Organization ("Articles")] or this Operating Agreement; (6) *any matter that could result in a change in the amount or character of the Company's capital;* (7) *any change in the character of the business and affairs of the Company;* (8) *the commission of any act that would make it impossible for the Company to carry on its ordinary business and affairs; or* (9) *any act that would contravene any provision of the Articles, Operating Agreement, or the Act.*

(Emphasis added). The Operating Agreement also provides that "[t]he Members shall have the right to vote on . . . the sale, exchange, lease, or other transfer of all or substantially all of the Company's assets other than in the ordinary course of business." Section 5.1(5).

24-47188-mar    Doc 119    Filed 09/30/24    Entered 09/30/24 16:07:09    Page 4 of 17

The Operating Agreement was amended on December 1, 2017. This amendment first recognized that Michael A. Nicholson became the Trustee of the Mary Trust. It also indicated that Michael A. Nicholson, Trustee of the Michael A. Nicholson Revocable Living Trust U/A/D 1/14/94 ("the Michael Trust") would be admitted as a member. As of January 1, 2017, the Bonnie Trust had a 50 percent membership interest in Debtor, the Mary Trust had a 40 percent membership interest, and the Michael Trust had a 10 percent membership interest.

### D. Amended Promissory Note

On January 1, 2017, Debtor executed an Amended Promissory Note, which contains a promise to pay the Mary Trust $3,893,186.54:

> with interest from the date hereof upon the unpaid principal at the Wall Street Journal Prime Rate, as published and modified from time to time by the *Wall Street Journal* (the current rate of which is 4.25%), until fully paid, and if any principal or interest is not paid when due, then interest upon the unpaid balance shall be at the rate of ten percent (10%) per annum during the period of any default in payment.

It also contains the following provisions:

> Interest shall be paid by the undersigned in lawful money of the United States of America not less than annually, and payments made in excess of the accured interest at anytime shall be applied against principal. The principal balance shall, in any event, unless a negotiated written extension is granted by the holder, be payable on or before January 1, 2020.
>
> \* \* \*
>
> If the holder has not received any payment of principal and interest within ten (10) days after it is due, the undersigned agrees to pay a late charge of three percent (3%) of the overdue payment.
>
> Should default be made in the payment of any installments of interest and/or principal due hereunder and such default shall continue for ten (10) days after written notice, then such default shall mature the entire indebtedness evidence hereby, without notice, at the option of both holders hereof.

Every person at any time liable for the payment of the debt evidenced hereby waives presentment for payment, demand and notice of non-payment of this Note and consents that the holder may extend the time of payment of any part or the whole of the debt at any time at the request of any other person liable.

### E. *State Court Lawsuit*

On January 17, 2023, the Mary Trust and the Michael Trust filed suit in the Oakland County Circuit Court against Debtor and related parties. Count IV of the Complaint is for Breach of Contract - Loan Made by Mary's Trust to Brewery. This count alleges:

> 53. Brewery has materially breached the terms of the Note by its failure and refusal to make interest payments on an annual basis as required by the Note, for which Mary's Trust has made demand for payment.
>
> \* \* \*
>
> 55. Brewery has materially breached the terms of the Note by its failure and refusal to pay the outstanding principal balance on, or before, January 1, 2020 as required by the Note, for which Mary's Trust has made a number of demands for payment.

Count V of the Complaint is for Unjust Enrichment - Loan Made by Mary's Trust to Brewery. This count alleges:

> 60. Brewery, through its acts, omissions and/or commissions, failed and/or refused to make annual installment payments, and failed and/or refused to pay the outstanding principal balance on, or before, January 1, 2020, for which Mary's Trust has made demand for payment.
>
> 61. Brewery, through its acts, omissions and/or commissions, and its failure and/or refusal to make annual installment payments, and failure and/or refusal to pay the outstanding principal balance on, or before, January 1, 2020, has become unjustly enriched at the expense of, and to the detriment of, Mary's Trust.
>
> 62. The reasonable value of the funds that Brewery received, and has failed an/or refused to repay, is in excess of Four Million ($4,000,000.00) Dollars.

> 63. Equity requires that Brewery properly compensate/reimburse Mary's Trust for the unjust enrichment that Brewery has received.

The Complaint also requests the appointment of a receiver "for the business and assets of [the] Brewery[.]"

On February 14, 2024, the Mary Trust and the Michael Trust filed a motion for partial summary judgment on their state court suit. After mediation failed, Debtor filed a response on July 9, 2024; the Mary Trust and the Michael Trust replied on July 17, 2024. Thus, the motion was fully briefed and awaiting final determination. Debtor filed bankruptcy nine days later, on July 26, 2024, and the Oakland County Circuit Court administratively closed the case due to the bankruptcy stay.

The Mary Trust and the Michael Trust allege that the amount owed under the Amended Promissory Note is now in excess of $8 million.

### F. *Action Taken to Effectuate a Sale of All or Substantially All of the Assets and Property of the Debtor*

Debtor admits the bankruptcy was filed "with the goal of pursuing a going concern sale of its assets to maximize [their value] for the benefit of creditors." (Dkt. No. 14, Declaration of Scott LePage, ¶15). Debtor also concedes that—outside of bankruptcy—such a sale would not be possible without the member consent of the Mary Trust and the Michael Trust. (Dkt. No. 114, at p. 47). Daniel F. Dooley's Declaration—filed on the same day as the bankruptcy in support of the motion to approve sale procedures—sheds light on when the decision to sell all or substantially all of the Debtor's assets was made:

> 1. On June 27, 2024 [a month before the bankruptcy filing], the Debtor employed and retained Morris Anderson & Associates, Ltd. ("MA") as its financial advisor to assist the Company in carrying out its duties under the Bankruptcy Code,

-7-

including but not limited to assisting with the preparation of schedules, a statement of financial affairs, monthly operating reports, [and] any other required reporting related to the above-captioned bankruptcy case.

2. The Company also appointed [] Daniel F. Dooley . . . as the sale agent of the Company to prepare marketing materials and a virtual data room for purposes of soliciting bids for substantially all of the Company's assets (the "Assets"), assist counsel for the Company in negotiating any stalking horse bidder asset purchase agreement, including developing appropriate bidding procedures, interfacing with all potential bidders for the Assets, and in the event that multiple qualified bids for the Assets are received, conducing an auction for the sale of the Assets.

*   *   *

4. Beginning on or around the date MA was retained, MA, under my guidance as the Sale Agent, began preparing the Debtor for a marketing and sale process. That work has involved: reviewing Debtor's financial history; preparing a two-page marketing solicitation "teaser" . . . to distribute to prospective buyers along with a draft Nondisclosure Agreement; preparing a detailed Confidential Information Memorandum to be provided to prospective buyers who execute a Nondisclosure Agreement; in coordination with counsel for the Debtor, creating a virtual data room to facilitate prospective buyer due diligence; and, creating a potential buyer prospect list.

5. On June 25, 2024, the Debtor signed a non-disclosure agreement with ESB Acquisition LLC ("ESB Acquisition").[4]

*   *   *

7. On July 17, 2024, I received an offer to purchase substantially all of the Debtor's assets from ESB Acquisition.

8. My understanding is that ESB Acquisition is a newly-formed entity formed for the purpose of acquiring substantially all of the assets of the Debtor and is wholly owned by one of[sic] more members of the LePage family.

---

[4]ESB Acquisition was formed on June 25, 2024. Its registered agent is Susanne LePage, the wife of Scott LePage and the daughter-in-law of Debtor's President and Manager, Bonnie LePage. Debtor also disclosed that ESB Acquisition is "wholly owned" by one or more members of the LePage family. (Dkt. No. 15, p. 4, ¶ 10).

-8-

9. In consultation with counsel for the Debtor, I negotiated a binding letter of intent with ESB Acquisition (the "Stalking Horse LOI") over the last week. I exchanged several offers and counteroffers with ESB Acquisition in these negotiations.

10. The Stalking Horse LOI was fully executed on July 24, 2024.

11. The Stalking Horse LOI requires, among other things that a binding asset purchase agreement ("Stalking Horse APA") must be negotiated and executed within fourteen (14) calendar days of its execution or the Stalking Horse LOI will be null and void. This term was created to put a time urgency on both parties to negotiate a detailed Stalking Horse APA promptly.

(Dkt. No. 15, Ex. B). To sell the business quickly, Debtor filed a motion requesting the Court hear its motion to approve sale procedures on an expedited basis because "time is of the essence." (Dkt. No. 16).

In addition, MA received a retainer in the approximate amount of $35,314 in the prepetition period (Dkt. No. 43, Application for an Order Authorizing Employment and Retention of Morris Anderson & Associates, LTD as Financial Advisor for Debtor, at ¶ 13). "MA also rendered services to the Debtor prior to the filing of these proceedings and has received payments for such services prior to the Petition Date." *Id.*

The Mary Trust and the Michael Trust seek to dismiss this bankruptcy for cause under 11 U.S.C. § 1112(b).[5]

### III. APPLICABLE LAW AND ANALYSIS

---

[5]The Mary Trust and the Michael Trust also seek the following alternative relief: (1) dismissal under 11 U.S.C. § 305(a)(1); (2) abstention of the bankruptcy case under 11 U.S.C. § 305(a)(1) or 28 U.S.C. § 1134 and termination of the automatic stay to continue the state court litigation; or (3) termination of the automatic stay under 11 U.S.C. § 362(d)(1) to continue the state court litigation. The Court need not address these arguments as it finds dismissal is appropriate under 11 U.S.C. § 1112(b).

Under 11 U.S.C. §1112(b)(1), "[o]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause[.]" If the Court finds that "those who purport to act on behalf of the corporation have not been granted authority by local law to institute the proceedings, it has no alternative but to dismiss the petition." *Price v. Gurney*, 324 U.S. 100, 106 (1945). As such, "[t]he Court . . . would be required to dismiss an unauthorized filing even if §1112(b) were not in the Bankruptcy Code." *In re ComScape Telecomms., Inc.*, 423 B.R. 816, 830 (S.D. Ohio 2010).

State law determines who has the authority to file a voluntary bankruptcy petition on behalf of a corporation. *Franchise Servs. of North Am., Inc. v. Macquarie Capital (USA), Inc. (In re Franchise Services of North America, Inc.)*, 891 F.3d 198, 206 (5th Cir. 2018). And "[a]s a contract between members of a limited liability company, the operating agreement is construed according to principles of contact interpretation." *BSA Mull, LLC v. Garfield Inv. Co.*, Nos. 310989, 311911, 315359, 315544, 2014 WL 4854306, at *12 (Mich. Ct. App. Sept. 30, 2014). "The fundamental goal of contract interpretation is to determine and enforce the parties' intent by reading the agreement as a whole and applying the plain language used by the parties to reach their agreement." *Dobbelaere v. Auto-Owners Ins. Co.*, 740 N.W.2d 503, 505 (Mich. Ct. App. 2007). "[C]ourts must . . . give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.3d 447, 468 (Mich. 2003).

    **A.**    ***Debtor's Operating Agreement Unambiguously Limits its President's Power to the "Ordinary and Usual Decisions Concerning the Business"—And Bankruptcy is Neither***

-10-

24-47188-mar    Doc 119    Filed 09/30/24    Entered 09/30/24 16:07:09    Page 10 of 17

The Operating Agreement is silent as to whether Debtor's President may unilaterally place Debtor in bankruptcy. Debtor argues that section 6.2 of the Operating Agreement is unambiguous because the plain language "broadly empowers the President 'to do *all things* necessary or convenient to carry out the Company's business and affairs, including the power to . . . (9) begin, prosecute, or defend any proceeding in the Company's name . . . .'" (Dkt. No. 101, pgs. 8–9) (Emphasis in original). Debtor says the bankruptcy filing simply began a proceeding in the Company's name.

In support of its argument, Debtor relies on *In re Energy Drilling Servs., LLC*, Case No. 22-31772-jda (Bankr. E.D. Mich. January 13, 2023). The operating agreement in that case prohibited members from causing the company to enter into a "Fundamental Business Transaction" without the approval of a super-majority of its members. The court found that

> [t]he filing of a petition under chapter 11 of the Bankruptcy Code is not included in the definition of Fundamental Business Transaction for the simple reason that the filing of a petition under chapter 11 of the Bankruptcy Code is not a *transaction* as that term is defined or used in the Operating Agreement.

*In re Energy Drilling Servs., LLC*, at 11 (Emphasis in original).[6] As such—and because the managing member was otherwise "exclusively vested with broad management authority over Debtor's affairs pursuant to . . . the Operating Agreement"—the court found that the managing member had the authority to unilaterally place debtor into bankruptcy. *Id.* at 12. Importantly, the *only* restriction on the authority of the managing member was entering into a "Fundamental Business Transaction," which the court found was not applicable to the filing of a bankruptcy

---

[6]This case is also distinguishable because the court found that "[t]he term '*Decision*' is very different from the more narrowly defined term '*Transaction*.' *In re Energy Drilling Servs., LLC*, at 16 (Emphasis in original). Here, Debtor's Operating Agreement authorizes its President to make "ordinary and usual *decisions*." (Emphasis added).

-11-

petition. *Id.* at 15. "Nothing in the Operating Agreement purport[ed] to limit [the managing member's] authority solely to 'ordinary' operations, although the parties could have drafted the Operating Agreement that way." *Id.* at 17.

The Court agrees with Debtor in one respect—section 6.2 of the Operating Agreement is unambiguous and must be enforced according to its terms. *See Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 259 (Mich. 2003) ("If the language of the contract is unambiguous, we construe and enforce the contract as written."). Debtor's Operating Agreement differs from that in *In re Energy Drilling Servs., LLC*. First, there is no mention of "transactions." Second, the parties *did* draft the Operating Agreement in this case to give the President the power only to make those ordinary and usual decisions necessary and convenient to carry out the Company's business and affairs. This limitation applies to beginning "any" proceeding in the Company's name. As counsel for Debtor concedes, filing bankruptcy is not in the ordinary course of business:[7]

| | | |
|---|---|---|
| THE COURT: | | [Do] [y]ou think a bankruptcy is in the ordinary course of business? |
| MR. BEST: | | No, I would not say that filing bankruptcy is in the ordinary course of business[.] |

\* \* \*

| | | |
|---|---|---|
| MR. BEST: | | Well, Your Honor, I would say that the first sentence where it does describe the ordinary and usual decisions – |
| THE COURT: | | Which you agree is not bankruptcy? |

---

[7]Examples of proceedings in the ordinary course of business may include Debtor's defense of a vendor's lawsuit, Debtor suing a vendor, civil rights proceedings, OSHA Complaints, workers' compensation claims, employment discrimination litigation, and debt collection litigation.

> MR. BEST: Yeah. Based on that one sentence, I don't think a debtor would have the corporate authority to file a bankruptcy if this was a one sentence 6.2 and it said ordinary.

(Dkt. No. 114, at pgs. 24, 26). *See also e.g., In re Karben4 Brewing, LLC*, 661 B.R. 392, 399–400 (Bankr. W.D. Wis. 2024) ("The Court rejects the argument that filing a bankruptcy is ordinary course of business. It is not. Filing bankruptcy is beyond the 'ordinary course' operations of the Debtor"); *In re Avalon Hotel Partners, LLC*, 302 B.R. 377, 380 (Bankr. D. Ore. 2003) ("A decision to file for bankruptcy protection is a decision outside of the ordinary course of business, even for an entity in dissolution.").

Debtor reads the first two sentences of section 6.2 of the Operating Agreement as providing two distinct grants of authority: first giving its President authority to make "the ordinary and usual decisions concerning the business and affairs of the Company as customarily performed by an organization's president" *and* second, as providing the *additional* authority to "do all things necessary or convenient to carry out the Company's business and affairs, including the power to . . . (9) begin . . . any proceeding in the Company's name[.]" The problem with Debtor's reading is the words "and," "additional," "further," "also," or other words of addition do not appear in the text. *Slam Dunk I, LLC v. Conn. Gen. Life Ins. Co.*, 853 F. App'x 451, 454 (11th Cir. 2021) (A basic principle of contract interpretation is that "courts do not add words to a contract"). The better reading of the provision is that the second sentence provides specifics as to the scope of authority set forth in the first sentence: The words "any proceeding" are limited to those that are "ordinary," "usual," and "customary."[8]

---

[8]"The doctrine of *noscitur a sociis*, i.e., that 'a word or phrase is given meaning by its context or setting'" applies here. *See G.C. Timmis & Co. v. Guardian Alarm Co.*, 662 N.W.2d 710, 713 (Mich. 2003) (Emphasis in original). As the Michigan Supreme Court explains:

Further support for this reading is found in Section 6.3, entitled "Limitations." For example, although on its face, section 6.2(1) gives the President the power to buy "any" real or personal property, section 6.3(1) expressly limits "any" to "significant and material purchase[s]." Similarly, the apparent authority in 6.2(2) to sell "any" real or personal property, is expressly limited in 6.3(2) to those sales that do not involve "all or substantially all of the assets and property of the Company." The clear intent of section 6.2 is to limit the unilateral authority of Debtor's President to those ordinary and usual decisions and those customary actions necessary and convenient to carry out its business, including the filing, and defense of, any ordinary or usual legal proceedings. Otherwise—as in the case of placing Debtor in chapter 11 (subchapter V) bankruptcy—the "unanimous consent of all Members" is required. Although bankruptcy is not explicitly mentioned in section 6.3, as requiring unanimous member approval, the following acts are: 6.3(2) the sale of all or substantially all of the assets and property of the Company; 6.3(6) any matter that could result in a change in the amount or character of the Company's capital; 6.3(7) any change in the character of the business and affairs of the Company; 6.3(8) the commission of any act that would make it impossible for the Company to carry on its ordinary business and affairs;[9] and 6.3(9) any act that would contravene any provision of the Articles,

---

"[a]lthough a phrase or a statement may mean one thing when read in isolation, it may mean something substantially different when read in context. 'In seeking meaning, words and clauses will not be divorced from those which precede and those which follow.'" *Id.* (internal citations omitted).

[9]"Filing a Chapter 11 proceeding, with the attendant (and oftentimes expensive and time-consuming) statutory duties placed on debtors-in-possession, and thus their management, essentially makes it impossible to conduct and operate a business as it was being conducted immediately before the filing of the petition." *DB Capital Holdings, LLC v. Aspen HH Ventures, LLC (In re DB Capital Holdings, LLC)*, Nos. CO-10-046, 10-23242, 2010 WL 4925811, at *3 (B.A.P. 10th Cir. Dec. 6, 2010); *see also id.* at *5 ("We believe . . . that the filing of a Chapter 11

-14-

24-47188-mar    Doc 119    Filed 09/30/24    Entered 09/30/24 16:07:09    Page 14 of 17

Operating Agreement, or the Act. Despite Debtor's protestations, the Court finds these provisions individually or collectively required unanimous member consent to place it in bankruptcy. *See* footnote 9, *supra*.

*In re East End Dev., LLC*, 491 B.R. 633 (Bankr. E.D.N.Y. 2013), another case on which Debtor relies, is also distinguishable. The operating agreement there gave the managing member broad powers to manage the debtor's operations. There were only three exceptions: commencing dissolution proceedings, winding up the debtor, and liquidating the debtor. The court found that filing bankruptcy was not among those three exceptions. *Id.* at 635–636. "[T]he list of actions requiring consent is clear, specific and limited. The filing of a bankruptcy petition is not equivalent to liquidation or dissolution." *Id.* at 640. Here, as discussed above, the Operating Agreement contains several limitations on the President's power, including the authority to only make ordinary and usual business decisions. This does not include the unilateral authority to file bankruptcy.

Because Debtor did not obtain unanimous member support to file bankruptcy, it must be dismissed.

> **B.** *Alternatively, Debtor's Manager and President's Unilateral, Prepetition Decision to Retain a Company to Market for Sale and Prepare an Insider's $2.1 Million Stalking-Horse Bid, Violated the Express Provisions of the Operating Agreement*

Debtor's President, Ms. LePage, is also a Manager. Section 6.3 of the Operating Agreement explicitly limits her managerial authority. It prohibits her from taking any act,

---

bankruptcy petition is an act that makes it impossible to carry on a company's 'ordinary business,' even though the company's ability to continue to 'do business' is not completely eliminated"). This is the *exact* language of section 6.3(8) of the Operating Agreement and requires unanimous member consent.

spending any money, exercising any power, or making any decision on behalf of the Company, except by the unanimous consent of all Members, with respect to "the sale of all or substantially all of the assets and property of the Company[.]" Section 6.3(2).

Even *before* the bankruptcy filing[10]—which contemplates a contemporaneous § 363 sale of all of the business assets—the Manager unilaterally decided to: (1) sell all or substantially all of the Company assets free and clear of the interests of the Mary Trust and the Michael Trust; (2) retain MA and authorize its retention of Mr. Dooley as the sale agent; (3) authorize the acceptance of a stalking-horse bid for the sale of all of the Company's assets from an insider, ESB Acqusition; and (4) pay MA over $35,000 for its work in setting up the procedure through which bids for the sale of all of the Company assets would be funneled, in direct violation of section 6.3.

Debtor cannot be permitted to file bankruptcy and use the Bankruptcy Code, *i.e.*, § 363, as a shield to insulate itself from its blatant prepetition violations of the Operating Agreement. Even assuming Debtor's President and Manager had the general authority to unilaterally file bankruptcy, this particular bankruptcy filing—which incorporated a contemporaneous stalking-horse bid and procedures to sell the business as a going concern without the required unanimous member approval, must still be dismissed for cause under section 1112(b).

IV.     CONCLUSION

---

[10]This is an important point because Debtor's argument suggests that once the petition was filed, a § 363 sale—a wholly bankruptcy permitted transaction—would not violate the unanimous member consent requirement of section 6.3. The Court need not, and does not, reach this issue. Debtor violated the express provisions of section 6.3 on multiple occasions in the 30 days before the petition was filed.

Debtor's Operating Agreement provides certain privileges of membership that must be respected. For the reasons stated above, the Court **GRANTS** the motion and **DISMISSES** this chapter 11 (subchapter V) bankruptcy.

    **IT IS ORDERED**.
**Signed on September 30, 2024**

                                            /s/ Mark A. Randon
                                            **Mark A. Randon**
                                            **United States Bankruptcy Judge**